Eugene Carey VENT, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7647.

Court of Appeals of Alaska.

April 11, 2003.

James E. McLain, Law Office of James E. McLain, Fairbanks, and Robert S. Noreen, Law Office of Robert S. Noreen, Fairbanks, for Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## *OPINION*

COATS, Chief Judge.

A jury convicted Eugene C. Vent of second-degree murder,[1] first-degree sexual assault,[2] second-degree assault,[3] and two counts of first-degree robbery[4] for the assault and robbery of Franklin Dayton and the robbery, sexual assault, and murder of J.H., a fifteen-year-old juvenile. Vent appeals his convictions, arguing that the superior court erred in denying his motion to suppress statements he made to the police, in allowing Fairbanks Detective Aaron Ring to testify to certain matters, and, in excluding Dr. Richard A. Leo from testifying at trial as an expert witness. For the reasons set forth below, we affirm Vent's convictions.

1. AS 11.41.110(a)(3).

2. AS 11.41.410(a).

3. AS 11.41.210(a).

4. AS 11.41.500(a).

*Factual background*

## I. The assault and robbery of Franklin Dayton

Franklin Dayton attended a wedding reception at the Eagles Hall in Fairbanks, which began on the night of October 10, 1997, and continued into the morning of October 11, 1997. After midnight on October 11, Dayton left the reception to take a walk downtown. As Dayton was walking down First Avenue, a car stopped behind him. Someone from the car tripped Dayton, pushed him down to the ground, stepped on his hand, kicked him in the ribs, and took his money. During the attack, Dayton was told to not look back and was instructed by someone to "give me your fucking money, bitch."

Arlo Olson, who was also attending the wedding reception and standing outside the Eagles Hall facing First Avenue, witnessed Kevin Pease, Marvin Roberts, George Frese and Vent attack Dayton and then get into a car and drive away. Later that night, Olson saw Frese again and noticed that he was limping. Edgar Henry, who was a friend of Vent, Frese, Pease and Roberts, told the police he saw them in Roberts's car on the night of October 10–11.

## II. The murder, robbery, and sexual assault of J.H.

J.H. met his mother at her job during the afternoon of October 10, borrowed some money from her, and put it in his wallet. J.H. spent the evening of October 10 with Chris Stone and a third friend, who was babysitting. The boys took some prescription drugs during the evening to get high. After consuming some of the pills, J.H. had a seizure and fell down. J.H. and Stone left the babysitting residence sometime after midnight. The boys parted company in downtown Fairbanks at approximately 1:15 a.m.

At approximately 1:30 a.m., Melanie Durham, who lived in a women's shelter, had been watching television when she stepped outside to have a cigarette. She heard noises coming from the corner of Ninth and Barnette. An obstructed view prevented her from visibly observing what was causing the

noise. Durham "heard a really bad smack" followed by several more smacks and then heard a young voice call out "help me, help me." The smacks continued and Durham described them as "calculated," "extremely hard," "horrendous punches." She then heard an angry, deep, slurry, intoxicated, male Native voice yell something.

At about 2:45 a.m., citizens driving down Ninth Avenue saw J.H. lying partly on the street and partly on the sidewalk near the corner of Ninth and Barnette. J.H.'s jacket was open, his pants were down, and his personal effects were scattered in the street. J.H.'s wallet was not among the items found at the scene and was never recovered. The police observed tire marks at the scene that were similar to the width and distance between the tires on Roberts's car. After one of the citizens called 911, the paramedics responded and took J.H. to the hospital.

A sexual assault examiner, Diane Hill, examined J.H. at the hospital and observed a lot of purplish red swelling and numerous minute tears around his anal verge. Hill also discovered a large, deep, long tear on J.H.'s anus, as well as abrasions on the wall of his rectum, three or four inches inside the anal verge.

About noon on October 11, Frese sought treatment for an injured foot at the hospital. Frese admitted he had kicked someone during a fight. The police subsequently seized the boot Frese was wearing. Fairbanks Police Lieutenant David Kendrick and nurse Julie Klaker compared the tread of Frese's boot with the injury on the left side of J.H.'s head. They found the sole of the boot to be similar to the impressions on J.H.'s head.

J.H. died as a result of the injures. Dr. Franc Fallico performed the autopsy. During the external examination, Dr. Fallico observed multiple separate injuries on J.H.'s head and body. During the internal examination, Dr. Fallico found blood clots on the surface of the brain and hemorrhages in the mid-brain; he attributed J.H.'s death to blunt-force trauma to his head. He found abrasions inside J.H.'s colon about four inches from his anus. Dr. Fallico also found

similarities between the tread pattern of Frese's shoes and the pattern on J.H.'s head.

Franklin Mueller, a fellow inmate of Vent's, testified that Vent told him that on the night J.H. was murdered, Vent, Frese, Pease, and Roberts were driving together in Roberts's car. Mueller further testified that Vent stated that Vent, Frese, Pease, and Roberts went out that night and beat people up. Joshua Bradshaw, another fellow inmate, testified that Vent stated "[w]e didn't mean to kick [J.H.] to death." Vent confessed to Detective Aaron Ring that he, Pease, Roberts, and Frese hit and kicked J.H.

Vent claimed at trial that he did not assault Dayton and J.H. Vent contended that Mueller and Bradshaw were not credible. He argued that Detective Ring pressured him into making a false confession by lying to him about the strength of the evidence against him.

The jury rejected Vent's defense. Superior Court Judge Ben J. Esch sentenced Vent to a term of imprisonment of 48 years with 10 years suspended. Vent now appeals his convictions. We affirm.

*Police interviews*

Detective Ring conducted three separate interviews with Vent. In the first interview, Detective Ring interviewed Vent for about two hours. Superior Court Judge Niesje J. Steinkruger found that Vent was warned of his *Miranda* rights, informed of his right to talk to his parents, and voluntarily waived those rights. But she found that part-way through this first interview, Vent made several ambiguous statements. She stated that these statements could be interpreted as a desire to terminate the questioning, or as a desire not to respond to further questions in a particular area, or that Vent was protesting because Detective Ring did not believe him. She concluded that because it was possible that these statements might have been a declaration of a desire to terminate the questioning, the State had not met its burden of proving that Vent waived his right to remain

silent. She therefore suppressed part of the first interview.

Judge Steinkruger concluded that the second and the third interviews were not tainted by Vent's first interview and were therefore admissible. She found that the second interview occurred four or five hours after the first interview. Vent had been allowed to sleep, was again warned of his *Miranda* rights, and was reminded of his right to have a parent present. Shortly after the interview began, Vent asked to call his mother and was allowed to do so. After he talked to his mother, Vent resumed talking to Detective Ring and made inculpatory statements.

Judge Steinkruger found that the third interview occurred approximately five or six hours after the second interview. Vent had both eaten and slept. He again waived his rights. Between the second and third interviews, Vent had talked to his mother. Judge Steinkruger pointed out that Vent had stated that he had not been coerced or threatened to make statements.

▇▇▇ Vent raises several arguments in claiming that Judge Steinkruger erred in failing to suppress the second and third interviews. He first contends that Judge Steinkruger erred in concluding that his statements were voluntary. Factors that impact the voluntariness of the confession include: "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[5] "The prosecution must prove the voluntariness of the confession by a preponderance of the evidence," and "[w]hen the accused is a juvenile, the state assumes a particularly heavy burden of proof."[6]

Judge Steinkruger found that Vent was 17 years and 11 months old, was a bright young man who was lucid and alert during the interviews, and did not demonstrate any mental impairment. The police questioned Vent in the first interview for about two hours, in the second interview for about an

**5.** *Sprague v. State,* 590 P.2d 410, 414 (Alaska 1979) (quoting *Brown v. United States,* 356 F.2d 230, 232 (10th Cir.1966)).

**6.** *Beavers v. State,* 998 P.2d 1040, 1044 (Alaska 2000).

hour and half, and in the third interview for twenty minutes. The second interview occurred approximately four hours after the first interview and took place after Vent had slept. The third interview occurred approximately five hours after the second interview and after Vent had both slept and eaten. The police had previously arrested Vent for theft and picked up Vent two or three times for being drunk. There was no evidence of physical deprivation, mistreatment, threats, or inducements. Judge Steinkruger found that the police had allowed Vent to contact his mother. She also found that Vent had not attempted to terminate the second and third interviews.

Reviewing the trial court's findings, Judge Steinkruger properly evaluated the external phenomenological facts and inferred the mental state of the accused and its legal significance. Judge Steinkruger's findings of fact were not clearly erroneous and she did not err in finding that the State met its heavy burden and proved the voluntariness of Vent's confession by a preponderance of the evidence. After independently reviewing the record, we conclude that, under the totality of the circumstances, Vent's confessions during his second and third interviews were voluntary.

■■■ Vent contends that once Judge Steinkruger determined that he had attempted to terminate the first interview, she should have found that the second and third interviews were tainted by the first interview and should have suppressed them. But the fact that Judge Steinkruger suppressed portions of Vent's first interview did not require her to exclude the second and third interviews.[7] In determining whether to suppress the subsequent interviews, the court needed to determine whether Vent's "decision to submit to the second and subsequent interviews was 'sufficiently an act of free will to purge the . . . taint' of the *Miranda* violation at the first interview."[8] The court was required to "consider a number of factors, in-

cluding whether *Miranda* warnings were given before the later statement, the time between the initial illegality and the later statement, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct."[9]

Over the years, the following factors have [also] been used to assess whether a defendant's subsequent statement is the tainted fruit of a prior illegality: the purpose and flagrancy of the initial illegal act, the amount of time between the illegal act and the defendant's subsequent statement, the defendant's physical and mental condition at the time of the subsequent statement, whether the defendant remained in custody or was at liberty during this interval, whether the defendant had the opportunity to contact legal counsel or friends during this interval, whether the subsequent interview took place at a different location, whether the defendant's interrogators were the same officers who committed the prior illegal act, whether the evidence obtained from the prior illegal act affected the defendant's decision to submit to a subsequent interview, whether the police used lies or trickery to influence the defendant's decision, and whether there were other intervening events that affected the defendant's decision.[10]

Judge Steinkruger applied these standards and concluded that the statements that Vent made in the second and third interviews were sufficiently separate and were acts of free will that purged any violation of his right to remain silent that had occurred during his first interview. She found that Detective Ring's failure to cease pursuing the first interview, or at least clarify any ambiguities in Vent's statements, was not a flagrant or purposeful violation. She concluded that it had been a very close question whether to suppress. She found that several hours had lapsed between the first and second interview and between the second and third inter-

7. *Halberg v. State*, 903 P.2d 1090, 1097–1100 (Alaska App.1995).

8. *Id.* at 1097 (quoting *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975)).

9. *Murray v. State*, 12 P.3d 784, 790 (Alaska App. 2000).

10. *Halberg*, 903 P.2d at 1098.

views. She found that Vent had opportunities to sleep, talk to his mother, and eat. She found that Detective Ring had not threatened or intimidated Vent. She did find that the police had misled Vent about the strength of the case against him in order to induce him to talk. But she concluded that this police tactic was not unusual or illegal and that the tactics did not overbear Vent's will.

Judge Steinkruger's findings are supported by the record and support her conclusion that Vent's second and third interviews were admissible. Our independent review of the record supports her conclusion.

### Detective Ring's testimony

■ Vent contends that the court erred in permitting Detective Ring to testify that one of the reasons he returned to question Vent in the second interview was because he did not believe Vent's statement in the first interview that Michael Ludenbocker and Mike Williams had been involved in an altercation near where J.H. had been attacked. He argues that it was improper for Ring to testify that Vent had not been truthful and that this statement was an improper comment on Vent's credibility.

But reading the transcript as a whole reveals that the purpose of the exchange was not to prove that Vent was a dishonest person, but rather to illustrate the reasons why Detective Ring decided to interrogate Vent a second time. Specifically, after the initial interrogation, Detective Ring investigated Vent's claim that he, Ludenbocker, and Williams were involved in a fight that night. Since Detective Ring's investigation revealed that Ludenbocker and Williams could not have been involved in the fight as Vent claimed, Detective Ring went back to interview Vent a second time and confront him with his misrepresentation.

Judge Esch did not err in allowing this testimony. The testimony was permissible to allow Detective Ring to show one of the reasons why he returned and interviewed Vent a second time. Vent had contended that Detective Ring had repeatedly questioned and pressured Vent, ultimately coercing his confession. Detective Ring's testimony was admissible to show one of the reasons why he continued to interrogate Vent.[11] Certainly, in some situations it would be unduly prejudicial for an officer to testify regarding the truthfulness of a defendant.[12] But, in this case, it is difficult to see how Vent was prejudiced by Ring's testimony. During the second and third interviews, Vent himself testified that he had not been truthful in his statements about Ludenbocker and Williams. In addition, Vent later testified that he had "made up" the information about Ludenbocker and Williams. Therefore, the fact that Vent had not been truthful in this part of his first statement was uncontested. Judge Esch could properly conclude that Detective Ring's explanation that one reason he returned to talk to Vent was that he did not believe Vent's story about Ludenbocker and Williams was admissible.

■ In support of his contention that Detective Ring pressured and coerced him into confessing, Vent's trial counsel cross-examined Detective Ring on the techniques that he had used to question Vent. Detective Ring admitted that he had misrepresented to Vent the evidence against him. He admitted that he had told Vent that Vent's clothes had blood splatter on them when this evidence did not exist. Vent's attorney suggested that this technique was coercive. In response, Detective Ring stated, "It's quite common. It doesn't make innocent people confess. It's a technique used by police officers all over the country for years, even when you were [a] prosecutor, Sir, and you didn't seem to have a problem with it then." Vent's counsel did not object and continued with his cross-examination.

On appeal, Vent contends that, although he did not object, the trial court committed plain error in allowing Detective Ring's statement. But we are to find plain error only when an error is "so obvious that it must have been apparent to a competent judge and a competent lawyer even without an objection and

---

**11.** See Sakeagak v. State, 952 P.2d 278, 282 (Alaska App.1998).

**12.** See Flynn v. State, 847 P.2d 1073, 1075–76 (Alaska App.1993).

... so substantially prejudicial that failing to correct it on appeal would perpetrate a miscarriage of justice." [13] Had Vent's attorney moved to strike Detective Ring's statement, it would probably have been granted. But Vent's counsel chose not to take this action. Counsel may have concluded that Detective Ring's arguably defensive statement tended to help Vent's case. We do not find plain error.

*Whether the trial court erred in refusing to allow Vent to call Dr. Richard Leo as an expert witness on police interrogation practices and the risk of false confessions*

■ A major portion of Vent's defense was his contention that Detective Ring pressured him into making false statements in which Vent implicated himself. Vent contends that Judge Esch erred in ruling that Dr. Richard Leo, an expert witness in the field of police interrogation practices, could not testify about the psychology of confessions and how police interrogation techniques can cause innocent people to confess to crimes they did not commit.

Dr. Leo received a bachelor's degree in sociology from the University of California at Berkeley, a masters degree in sociology from the University of Chicago, a J.D. from Berkeley, and a Ph.D in jurisprudence and social policy from Berkeley. He wrote his dissertation on the history, psychology, and law of police interrogation practices in the 20th century. Dr. Leo is currently an assistant professor of criminology and an assistant professor of psychology at the University of California at Irvine. He has studied and conducted research in the field of police interrogation, as well as taught classes on police interrogation practices, confessions, and the criminal justice system. Dr. Leo has published numerous peer reviewed articles on police coercion, persuasion, and interrogation. He is also familiar with various case studies in which a person confesses to a crime that was impossible for them to have committed.

Based on his education and research, Dr. Leo was going to testify, *inter alia*, that:

there is the common belief that people do not make unreliable or false statements unless they're tortured or mentally ill. And I would explain that that—that's not the case, sometimes people do make false statements, even if they're not physically tortured or mentally ill, that there—there is psychological research that explains how certain techniques can lead people to make the decision to confess whether they're guilty or innocent. And that there are certain principles of analysis that researchers use to evaluate whether or not a statement is likely reliable or likely unreliable....

. . .

[The testimony would explain] how interrogation works to produce confessions, particular techniques and what their impact can be on someone's decision making.

Alaska Rule of Evidence 702(a) states that:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ "To be admissible, expert testimony must (1) address an issue beyond the common knowledge of the average layman, (2) be presented by a witness having sufficient expertise, and (3) assert a reasonable opinion given the state of the pertinent art or scientific knowledge." [14] Pursuant to Rule 702, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." [15] "The general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony." [16] One of the purposes of

**13.** *Potts v. State,* 712 P.2d 385, 390 (Alaska App. 1985).

**14.** *United States v. Vallejo,* 237 F.3d 1008, 1019 (9th Cir.2001).

**15.** *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993).

**16.** *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir.1973).

admitting expert testimony is "to inform the court and jury about affairs not within the full understanding of the average man." [17] "When the subject of inquiry is one which common knowledge would enable one to decide, it is not a proper subject for expert testimony. It is for the trial court in the exercise of a sound discretion to determine whether expert testimony is appropriate under the circumstances of the case." [18]

The touchstone of admissibility under Rule 702 is helpfulness to the jury. An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather [than] simply an opinion broached by a purported expert.[19]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme Court established a two-part test for determining whether to admit expert testimony,[20] which the Alaska Supreme Court adopted in *State v. Coon.*[21] "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a),[22] whether the expert is propos-ing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." [23] *Daubert* sets out a number of factors for determining whether scientific evidence is valid.[24] The factors are whether the expert's reasoning: (1) can be and has been tested; (2) has been subject to peer review; (3) has a known or potential rate of error; and (4) generally has been accepted by the scientific community.[25]

Expert testimony should be admitted only if it is both reliable and relevant.[26] The Unites States Supreme Court has stated that *"Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." [27] Therefore, the Court stated that the *Daubert* factors, designed for the admission of scientific evidence, must be applied flexibly and with regard to the type of testimony being offered.[28] However as at least one commentator has explained, "[T]he upshot is that although the *Daubert* Court may have selected the optimal test for the admissibility of scientific evidence, that test

17. *Id.* at 1152–53 (quoting *Farris v. Interstate Circuit,* 116 F.2d 409, 412 (5th Cir.1941)).

18. *Cohen v. W. Hotels, Inc.,* 276 F.2d 26, 27 (9th Cir.1960) (quoting *Duff v. Page,* 249 F.2d 137, 140 (9th Cir.1957) (concluding that a jury can determine, without expert assistance, whether the installation of carpet caused the edge of a rug to wrinkle)).

19. *TRW Title Ins. Co. v. Sec. Union Title Ins. Co.,* 887 F.Supp. 1029, 1031 (N.D.Ill.1995) (quoting *United States v. Benson,* 941 F.2d 598, 604 (7th Cir.1991) and finding that expert "opinion is based solely on deposition transcripts and exhibits," court excluded expert opinion "because it [did] not rely on any expertise but [was] comprised of inferences from the record that [the expert was] no more qualified than the jury to draw"); *see also City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 565 (11th Cir.1998) (noting under facts of case that "the trier of fact is entirely capable of determining whether or not to draw such conclusions without any technical assistance from ... experts"); *Jetcraft Corp. v. Flight Safety Int'l,* 16 F.3d 362, 366 (10th Cir. 1993) (holding that "the district court properly prohibited plaintiffs' expert from doing what the jury could do just as well on its own, i.e., infer the presence or absence of negligence from the circumstantial evidence adduced at trial").

20. *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796.

21. 974 P.2d 386, 402 (Alaska 1999).

22. F.R.E. 104(a) ("Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court.... In making its determination it is not bound by the rules of evidence except those with respect to privileges."); *also* A.R.E. 104(a) (stating the identical Alaska rule).

23. *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796 (footnotes omitted).

24. *Id.* at 593–94, 113 S.Ct. at 2796–97.

25. *Id.*

26. *Id.* at 589, 113 S.Ct. at 2795.

27. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999).

28. *Id.* at 150, 119 S.Ct. at 1175.

is useless as a criterion for the admissibility of other types of expert testimony." [29]

Where courts are faced with the issue of admitting non-scientific expert testimony, it is difficult to set out objective standards for when such testimony is admissible.[30] Non-scientific opinions are not based on experiments that can be replicated and tested.[31] Yet our society relies on these experts, such as an attorney to testify about the standard of practice in a particular field, or an auto mechanic to testify about the function and repair of an automobile. Determining whether these experts, who testify from experience rather than scientific experimentation, will be helpful to the jury can be a challenging question.[32] But the trial court has great discretion in exercising its gatekeeping function to determine whether expert testimony based on experience should be admissible.

In the present case, after hearing Vent's offer of proof, Judge Esch determined that Dr. Leo's testimony would not appreciably aid the jury in determining whether Vent made a false confession. He indicated that he was troubled by the fact that there was no way to quantify or test Dr. Leo's conclusions that certain techniques might lead to false confessions. He also concluded that jurors would be aware that some people do make false confessions and that this proposition could be developed by questioning and argument.

Reviewing the law in other jurisdictions reveals that there is some support for and against the admissibility of false confession expert testimony. For example, in *United States v. Hall*,[33] the Seventh Circuit concluded that the trial judge had excluded false confession expert testimony by improperly applying the *Daubert* standards.[34] On remand, the district court admitted testimony similar to Dr. Leo's.[35] We would emphasize, however, that in that case, the appellate court did not determine that the failure to admit such testimony was error. Furthermore, at least as set out in the district court's decision in *Hall*, the proposed testimony in that case appears to have been more probative than the offer of proof in Vent's trial. Various other courts have upheld the admissibility of false confession expert testimony.[36] But in numerous other cases, appellate courts have concluded that a trial court does not abuse its discretion in refusing to admit this testimony.[37]

**29.** Edward J. Imwinkelried, *The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony*, 15 Cardozo L.Rev. 2271, 2285 (1994).

**30.** See *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. at 1171.

**31.** Imwinkelried, *supra*, at 2284–85.

**32.** See *id.* at 2293–94.

**33.** 93 F.3d 1337 (7th Cir.1996).

**34.** *Id.* at 1346.

**35.** 974 F.Supp. 1198, 1204–05 (C.D.Ill.1997), *aff'd*, 165 F.3d 1095 (7th Cir.1999).

**36.** See, e.g., *United States v. Shay*, 57 F.3d 126, 129–30 (1st Cir.1995) (finding trial court erred in excluding expert testimony regarding defendant's mental condition that caused him to give false confession); *United States v. Raposo*, 1998 WL 879723, at 5–6 (S.D.N.Y. Dec.16, 1998) (admitting expert testimony on false confessions); *Callis v. State*, 684 N.E.2d 233, 239 (Ind.App.1997) (affirming trial court's decision to admit, on limited grounds, expert witness testimony regarding police interrogation tactics); *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65, 72–74 (1998) (holding that the trial court committed prejudicial error when it excluded expert testimony on false confessions); *State v. Baldwin*, 125 N.C.App. 530, 482 S.E.2d 1, 5 (1997) (holding that the trial court erred in excluding expert witness testimony that police interrogation tactics made defendant susceptible to giving a false confession).

**37.** See, e.g., *United States v. Griffin*, 50 M.J. 278, 284 (U.S.A.F.1999) (holding that testimony of defense expert on false confessions properly excluded as not sufficiently reliable); *State v. Cobb*, 43 P.3d 855, 869 (Kan.App.2002) (concluding that Dr. Leo's testimony invaded the province of the jury and that argument and cross-examination were sufficient to illicit problems with police interrogation techniques); *State v. Tellier*, 526 A.2d 941, 944 (Me.1987) (affirming trial court's ruling that false confession expert testimony would not be of assistance to the jury); *State v. Davis*, 32 S.W.3d 603, 608–09 (Mo.App.2000) (affirming the trial court's decision to exclude Dr. Leo's testimony on the ground that the testimony invaded the province of the jury); *State v. Free*, 351 N.J.Super. 203, 798 A.2d 83, 95–96 (2002) (reversing trial court's ruling that admit-

After a close examination of the science and court decisions in this area, one scholar has concluded:

> The unusual nature of the social sciences like psychology and social psychology may require a somewhat lower standard of scrutiny than the "hard" sciences like physics or chemistry, but *Daubert* remains a valid guideline for most scientific evidence, both hard and soft. For too long the behavioral sciences and the criminal justice system have neglected the phenomenon of false confessions. Professors Gudjonsson, Kassin, Wrightsman, Leo, and Ofshe, have opened a door on a new and little understood aspect of the interrogation process. This is not "voodoo science" but is not yet ready for "prime time" either.
>
> The false confession theory needs further study and refinement. Consequently, the admission of expert testimony based on this new theory is premature and therefore unreliable. Currently, the empirical base that supports the theory has too many unanswered questions, no known error rate, and just one laboratory experiment to back it up. This foundation cannot support reliable conclusions just yet.
>
> . . .
>
> Gudjonsson, Leo, and Ofshe present haunting tales that clearly establish the existence of false confessions. While every case of wrongful conviction from a false confession is a travesty of justice, these cases cannot be viewed in the abstract. Many of the tactics used by police that create false confessions typically result in true confessions as well. . . . A lack of corroborating evidence may also be a sign of a weak case or a lack of evidence, but it does not necessarily mean the confession was false. To encourage further study in this area, courts should exercise their discretion as the "gatekeepers" of expert testi-

mony and find the psychology of false confessions unreliable at this time.

> Still, the admissibility of expert testimony based on the psychology of false confessions cannot be ruled out. Two federal appellate courts have found this testimony admissible and the state courts are split on the issue of the reliability of this theory. In light of the *Kumho Tire Co.* case, no trial court judge should fear the appellate courts on the reliability issue. Almost every trial judge who found this evidence reliable or unreliable has been upheld on appeal. Few have been found to abuse their discretion.[38]

The case law and law review commentary is split over whether to admit false confession expert testimony. Our review of the authorities and the record convince us that there is merit to Judge Esch's questions concerning Dr. Leo's methodology and whether his testimony would appreciably aid the jury. We conclude that whether to admit Dr. Leo's testimony and the determination whether his testimony would appreciably aid the jury in this case is a question that fell within the broad discretion reserved to the trial court. We accordingly conclude that Judge Esch did not err in refusing to admit Dr. Leo's testimony.

The convictions are AFFIRMED.

MANNHEIMER, Judge, concurring.

I agree that Judge Esch acted within his proper discretion when he refused to allow Vent to present the expert testimony of Dr. Richard Leo. However, unlike my colleagues, I do not believe that this question hinges on the *Daubert–Coon* rule governing the admission of scientific testimony. Rather, Judge Esch's ruling should be upheld on the basis he himself articulated: Dr. Leo's proposed testimony would not appreciably aid the jury because it was based on common sense rather than scientific expertise.

ted expert false confession testimony); *Green v. State*, 55 S.W.3d, 633, 640 (Tex.App.2001) (affirming trial court's decision excluding expert's false confession testimony).

**38.** Major James R. Agar, II, *The Admissibility of False Confession Expert Testimony*, 1999 Army

Law 26, 42–43 (1999); *see also* Paul G. Cassell, *The Guilty and the Innocent: An Examination of Alleged Cases of Wrongful Conviction from False Confessions*, 22 Harv. J.L. & Pub. Pol'y 523 (1999) (criticizing Dr. Leo's methodology).

Dr. Leo was extensively examined (outside the presence of the jury) concerning his proposed testimony. He stated that, if allowed to testify, he wished to dispel "the common belief that people do not make unreliable or false statements unless they're tortured or [are] mentally ill." Dr. Leo continued:

> I would explain that that's not the case. Sometimes, people do make false statements, even if they're not physically tortured or mentally ill. . . . There is psychological research that explains how certain [interrogation] techniques can lead people to make the decision to confess, whether they're guilty or innocent. And . . . there are certain principles of analysis that researchers use to evaluate whether or not a statement is likely reliable or likely unreliable.

Dr. Leo then explained that, "with regard to the question of [a confession's] reliability, what researchers look at is the post-admission [narrative] that the suspect gives—what the suspect says after the words, "I did it." What we call the "post-admission narrative." [We examine] whether that post-admission narrative fits the facts of the crime and demonstrates that the suspect possesses actual knowledge [of what the suspect is describing]. If the suspect is giving a truthful and reliable confession, one would expect the confession to fit the facts of the crime . . . [and] to lead to new evidence where applicable, . . . derivative evidence, [and] to reveal details that were only known by the police [and] the true perpetrator, . . . not public knowledge, and [one would also expect the confession] to be corroborated by physical and medical evidence.

Later, during cross-examination by the prosecutor, Dr. Leo summarized his two areas of expertise. First, Leo told the court that he had investigated, and could testify about, the techniques that are effective in getting people to admit things that are against their own self-interest. Second, Leo told the court that he had investigated, and could testify about, the principles that allow researchers to determine whether the confession is reliable or not—the same principles that he described in the excerpt just quoted.

With regard to Dr. Leo's first area of expertise—his study of interrogation techniques—Leo did *not* claim the ability to tell whether specific interrogation techniques had caused an innocent person to falsely confess, nor did Leo claim that he could discern when specific interrogation techniques had overborne a suspect's will. He clarified that "[his] expertise is not on psychological mental states, but on the interrogation techniques and tactics, and their influence on decision-making." Leo explained that he was *not* an expert on the mental state of the confessing suspect—not able to identify whether a particular suspect was more susceptible or less susceptible to interrogation techniques, or whether a particular suspect was atypically influenced by the suggestions of his interrogators.

Rather, Leo told the court, his area of expertise was identification of the techniques that interrogators generally employ to convince suspects to confess. Leo had no opinion to offer as to whether these techniques led to truthful or false confessions. In fact, he told the court:

> *Dr. Leo:* Even if an interrogation is [overtly] coercive, it still could produce a true confession. And so one can't infer from the [interrogative] techniques that are used, . . . proper or improper, whether or not the confession is false. The only way to do [that] is to objectively analyze whether the suspect demonstrates actual knowledge [of the crime] and how [the suspect's narrative] fits with the record or doesn't fit with the record.

In sum, Dr. Leo told the court that he did not intend to express an opinion as to whether Vent did or did not participate in the homicide, or whether Vent was telling the truth or speaking falsely when he made his statements to the police. Instead, Dr. Leo proposed to acquaint the jury with the principles he had described for evaluating the truthfulness or reliability of a confession.

It is true that, in response to a question from Vent's attorney, Dr. Leo agreed that "there are scientifically known, provable ways to verify that a statement made to [the] police is true, accurate, and reliable." But

Leo was speaking only of the principles he had enunciated before: the "fit" between the person's confession and the known facts of the crime. This became obvious when Leo offered examples of how his principles might be used to show that a confession was false. Leo offered the following examples: (1) a suspect confesses to a homicide, but later the purported victim shows up alive; (2) a suspect confesses to a crime, but later investigation shows that it would have been physically impossible for the suspect to have committed the crime—as, for instance, where the suspect was in prison or in another state at the time of the crime; and (3) a suspect confesses to a crime, but DNA analysis later shows that the suspect is definitely not the perpetrator.

At this point, Judge Esch asked Dr. Leo if there were other factors, besides the "fit" of the suspect's narrative with the facts of the case, that were relevant to assessing the truthfulness or reliability of a confession. Leo answered, "Not really."

After hearing this, Judge Esch wondered aloud whether Leo's proposed testimony would be of appreciable help to the jury, since his analysis appeared to be based on common sense rather than academic study or research. A few minutes later, after he had heard the arguments of the parties, Judge Esch formally ruled that Leo would not be allowed to testify concerning his technique for evaluating the truthfulness or reliability of a confession, since this technique amounted to nothing more than testing the details of the confession against the known facts. Judge Esch concluded that this was not a proper subject for expert testimony because

the jurors would understand this without explanation from an expert.

After hearing a little more voir dire, Judge Esch preliminarily ruled that Dr. Leo would be allowed to testify concerning his study of police interrogation techniques, "but that alone." [1] The judge explained that he did not want Leo "to go into whether . . . those [methods] are correct or incorrect, or the value of [the resulting] confessions—[whether they are] reliable or unreliable."

Under Alaska Evidence Rule 702(a), expert testimony is allowed when it will "appreciably assist the trier of fact." [2] The test is "[whether] the witness' special knowledge [will] assist the trier of fact to understand the evidence or determine a fact in issue." [3] And, as the Alaska Supreme Court stated in *D.H. v. State*, "[t]he decision to admit opinion testimony into evidence lies within the sound discretion of the trial judge and is reviewable only for abuse of discretion." [4]

Dr. Leo has earned university degrees (including a law degree) and, for several years, he has focused his studies on police interrogation techniques. But Dr. Leo's academic and research achievements are not determinative of whether Judge Esch should have allowed him to testify. The real question is whether Dr. Leo's proposed testimony was based on analysis or research that was beyond the ken of the normal juror. A witness may be an "expert" in the sense that they have specialized training or experience not shared by most people, but, under Evidence Rule 702(a), the proponent of the witness's testimony must further show that their proposed testimony is in fact grounded on this specialized training or experience.

Here, Judge Esch concluded that most of Dr. Leo's proposed testimony was not based

---

1. Leo proposed to give the following testimony concerning police interrogation techniques: The basic interrogation technique used by police is first to make the suspect feel that they are "trapped" or that their situation is hopeless; then, the police make the suspect feel that they can improve their situation if they confess. Thus, even though a confession is generally perceived to be against the confessing person's self-interest, the suspect begins to view the confession as actually promoting their self-interest. In instances where the suspect denies any memory of the crime, the police sometimes employ an alternative interrogation technique, which is to confront the suspect with physical evidence

and/or the reports of other witnesses, attempting to convince the suspect that, though he may not remember it, he must have committed the crime.

2. *Coburn v. Burton*, 790 P.2d 1355, 1358 (Alaska 1990), quoting *D.H. v. State*, 561 P.2d 294, 297 (Alaska 1977).

3. *Shepard v. State*, 847 P.2d 75, 80 (Alaska App. 1993), quoting *Norris v. Gatts*, 738 P.2d 344, 350 (Alaska 1987).

4. 561 P.2d 294, 297 (Alaska 1977).

on specialized training or experience, but rather was based on the common-sense notion that the truthfulness or reliability of a defendant's confession should be tested by seeing how the defendant's account meshed with the facts of the case. Judge Esch's conclusion is firmly supported by the record of Dr. Leo's voir dire.

We addressed a similar situation in *New v. State*, 714 P.2d 378 (Alaska App.1986). The defendant in *New* offered an expert witness who would testify about the "point of no return" that a truck driver (or any motorist) would ultimately reach when confronted with a traffic emergency—the point at which the driver must commit to a particular course of action and hope for the best. The trial judge refused to allow the defendant to offer this testimony, and this Court upheld the trial judge's decision. We said:

> We perceive no abuse of discretion in the present case. At best, [this witness's] testimony would have been cumulative and only marginally relevant. New's point of no return defense was based on a common sense notion, which is readily capable of being understood by lay persons. [The proposed witness's] testimony concerning the options open to a truck driver who goes beyond the point of no return would have added little to the understanding that any juror could reasonably be expected to have without the need for expert testimony.

*New*, 714 P.2d at 380.

Based on Dr. Leo's voir dire, Judge Esch could reasonably conclude that Dr. Leo's principles for determining the truthfulness or reliability of a confession amounted to nothing more than the common-sense notion that a confession must be tested against the known facts. This being so, Judge Esch did not abuse his discretion when he ruled that Leo's proposed testimony on this subject was not admissible under Evidence Rule 702(a).

For these reasons, I join my colleagues in upholding Judge Esch's decision to substantially restrict Dr. Leo's testimony.