DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Archie Wooden, appeals from his conviction in the Summit County Court of Common Pleas of one count of murder, one count of felonious assault, and two counts of endangering children. We affirm.
 I. {¶ 2} On November 6, 2006, paramedics were called to the home of eighteen-month-old Cameron Allen, who was unresponsive when they arrived. Cameron was transported to Akron Children's Hospital, where he was pronounced dead. At the hospital, Wooden told police that he had briefly left Cameron alone in the bathtub and, when he returned, the child had fallen under the water and was having trouble breathing. This account of the events preceding Cameron's death was inconsistent with the results of the autopsy, however, which revealed that Cameron had died from blunt force trauma and his death was ruled a homicide. As Cameron had *Page 2 
been left in the care of Wooden, the boyfriend of Cameron's mother, the police investigation focused on him as a suspect.
 {¶ 3} Two days later, Akron Police arrested Wooden. During a series of interviews by four different detectives, Wooden eventually admitted that he had killed Cameron. Wooden explained how he had inflicted Cameron's injuries by punching him in the stomach, holding him upside down and repeatedly hitting his head on the floor, and finally by throwing the toddler into a bathtub with the water running. Wooden was charged with aggravated murder with a death specification, murder, three counts of felonious assault, and two counts of endangering children.
 {¶ 4} Prior to trial, Wooden moved to suppress his statements to police, contending that he had involuntarily made incriminating statements due to the improper interrogation tactics of the police. After holding a hearing on the motion, the trial court found that Wooden's statements had been voluntary and denied the suppression motion. Following a pretrial hearing on the issue, the trial court also refused to allow Wooden to present the testimony of a criminologist who would testify about his research in the area of false confessions.
 {¶ 5} Following a jury trial, Wooden was convicted of one count of murder, one count of felonious assault, and two counts of endangering children. Wooden appeals and raises two assignments of error.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT ERRED IN DENYING [WOODEN'S] MOTION TO SUPPRESS HIS CONFESSION AS IT WAS NOT VOLUNTARILY MADE."
 {¶ 6} Through his first assignment of error, Wooden argues that the trial court erred in failing to suppress his oral statements to police. Wooden does not dispute that he was repeatedly given hisMiranda rights, that he understood those rights, and that he waived his right to remain *Page 3 
silent. Instead, he maintains that the police coerced an involuntary confession from him by using improper interrogation tactics.
 {¶ 7} "[T]he state carries the burden of proving the voluntariness of a confession by a preponderance of the evidence." State v. Hill (1992),64 Ohio St.3d 313, 317. The voluntariness of a confession is reviewed under a totality-of-the-circumstances standard. State v. Clark (1988),38 Ohio St.3d 252, 261. The totality of the circumstances includes "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus, overruled on other grounds in Edwards v. Ohio (1978),438 U.S. 911. Absent evidence that a defendant's will was overborne and that his capacity for self-determination was critically impaired because of coercive police conduct, the decision of a suspect to waive his right to Fifth Amendment privilege against self-incrimination is considered voluntary. State v. Dailey (1990), 53 Ohio St.3d 88, 91-92.
 {¶ 8} The record before the trial court at the suppression hearing revealed no coercive police conduct that overbore Wooden's free will. On November 8, 2006, four police detectives conducted a series of interviews with Wooden. Most of Wooden's interrogation was recorded either on audiotape or videotape. Prior to the suppression hearing, the trial court reviewed the audiotape and videotape recordings of Wooden's interrogation by police. The detectives read Wooden his Miranda rights three different times, and Wooden appeared to understand his rights and chose to speak with the police.
 {¶ 9} At the suppression hearing, the State presented the testimony of two of the detectives who interviewed Wooden. Wooden's first interview by Akron police detectives began *Page 4 
in the early afternoon at 12:18 p.m. and concluded one hour and nineteen minutes later. Another detective then interviewed Wooden for approximately 40-45 minutes.
 {¶ 10} After a break, Detective Sergeant Butler interviewed Wooden for approximately two and one-half hours. During that interview, Wooden admitted that he struck Cameron in the stomach and threw him in the bathtub. After a ten-minute break, the original two detectives returned to further question Wooden because they wanted to determine how Cameron had sustained severe bruising to his head. Wooden described how, after striking Cameron in the stomach and sliding him across the floor, he had picked the child up and bounced his head on the floor six to seven times. The final interview ended after approximately one hour.
 {¶ 11} The series of interviews lasted less than six hours altogether and Wooden was given several breaks between the interviews by the different detectives. When Wooden told one detective that he had not eaten, he was given a meal. Wooden was also provided with drinks, a snack, and a cigarette when he asked for one. Although Wooden told them that he had not had much sleep, one detective testified that Wooden remained coherent during the questioning and did not appear to be extremely tired. Moreover, the interviews were conducted during the middle of the afternoon.
 {¶ 12} The record also reveals that the detectives did not physically mistreat Wooden, nor did they make any threats or promises to him to elicit his statements. Although one of the detectives suggested to Wooden that he should get counseling, he never told Wooden that he would receive counseling in lieu of incarceration if he confessed.
 {¶ 13} Given the evidence before the trial court on the totality of the circumstances surrounding Wooden's confession, the State established by a preponderance of evidence that Wooden's confession was not coerced in any manner but was given voluntarily. The trial court *Page 5 
did not err in denying Wooden's motion to suppress and his first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED AND DENIED [WOODEN] HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHEN IT DENIED [WOODEN] THE OPPORTUNITY TO PRESENT THE TESTIMONY OF DR. LEO AT TRIAL."
 {¶ 14} Because the trial court denied Wooden's suppression motion that challenged the voluntariness of his confession, Wooden planned to offer evidence at trial that his confession was not reliable due to the interrogation tactics that the police used. Wooden sought to admit the expert testimony of Dr. Richard Leo, an expert in the field of criminology, to challenge the reliability of the statements Wooden made to police. Wooden planned to have Dr. Leo testify about his research in the area of false confessions. Specifically, Dr. Leo's testimony would focus on describing certain police interrogation techniques that tend to induce confessions and would also reveal the results of his studies in the area of false confessions. Dr. Leo would not offer an opinion regarding the truth or falsity of Wooden's confession but, according to Wooden, Dr. Leo would provide the jury with background information to assist in its assessment of the reliability of Wooden's confession.
 {¶ 15} Prior to trial, the State moved to exclude Dr. Leo's testimony. Following a hearing to determine the admissibility of Dr. Leo's testimony, the trial court held that the testimony of Dr. Leo would not be admitted as expert testimony under Evid. R. 702 because it was not scientifically reliable and it also did not relate to matters beyond the knowledge of lay people. Wooden preserved this issue for review by again raising the admissibility of Dr. Leo's testimony during trial. *Page 6 
 {¶ 16} The trial court's decision to admit or exclude evidence lies within its sound discretion and the decision will not be reversed by a reviewing court absent an abuse of that discretion. See State v.Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. An "abuse of discretion" means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med.Bd. (1993), 66 Ohio St.3d 619, 621.
 {¶ 17} Expert testimony must meet the criteria of Evid. R. 702, which provides, in pertinent part, that a witness may testify as an expert if all of the following apply:
 "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons[;]
 "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information." Evid. R. 702.
 {¶ 18} The State did not dispute that Dr. Leo had specialized knowledge and education, but it did dispute whether Dr. Leo's testimony related to matters beyond the knowledge of the jury and whether his testimony was based on reliable scientific information. This Court will address these two Evid. R. 702 factors in turn. Because the parties and the trial court focused first on whether Dr. Leo's testimony was scientifically reliable under Evid. R. 702(C), this Court will begin with that factor.
 Scientific Reliability {¶ 19} To determine whether a proposed expert's testimony about a scientific technique or a scientific methodology is scientifically reliable, the trial court focuses on the factors identified by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals,Inc. *Page 7 
(1993), 509 U.S. 579, as adopted by the Ohio Supreme Court in Miller v.Bike Athletic Co. (1998), 80 Ohio St.3d 607, 611-612. See, also,Terry v. Caputo, 115 Ohio St.3d 351, 356, 2007-Ohio-5023, at ¶ 24-25. These factors include: (1) "whether a theory or technique * * * can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) general acceptance in the scientific community.Daubert, 509 U.S. at 593-594.
 {¶ 20} The trial court found that Dr. Leo's testimony failed to satisfy the Daubert factors and, therefore, was not scientifically reliable. This conclusion was supported by the evidence in the record.
 {¶ 21} The evidence before the court demonstrated that Dr. Leo is well educated and that he has done extensive research in the area of police interrogation techniques and confessions. Dr. Leo testified about his research on false confessions, indicating that he has published several articles on the subject and that he has studied thousands of confessions. His proposed trial testimony consisted of general information about different police interrogation techniques and their potential to induce a confession. Dr. Leo would explain that certain interrogation techniques were more coercive than others and he was prepared to testify about the potentially coercive effect of the specific interrogation tactics that were used during the interrogation of Wooden.
 {¶ 22} Dr. Leo further explained that coercive interrogation techniques do tend to be effective in producing their desired result: a confession. He conceded on cross-examination, however, that coercive techniques are also effective in inducing true confessions and he could not offer any opinion as to how many of the resulting confessions are truthful and how many are *Page 8 
false. Thus, he could offer no expert insight into the actual likelihood that coercive interrogation tactics will lead to a false confession.
 {¶ 23} Of particular significance to the Daubert analysis here, Dr. Leo has not formulated a specific theory or methodology about false confessions that could be tested, subjected to peer review, or permit an error rate to be determined. Dr. Leo's research on false confessions has consisted of analyzing false confessions, after they have been determined to be false. Dr. Leo explained that confessions are sometimes proven to be false after the fact through DNA exoneration, physical impossibility, or when the true perpetrator is caught. Dr. Leo has looked back at many such confessions and focused on reviewing the interrogation techniques that had preceded the false confessions, in an attempt to find common variables. Dr. Leo's research has focused in particular on similarities in the interrogation techniques that led to the false confessions. His research, however, has not led to any concrete theories or predictors about when and why false confessions occur.
 {¶ 24} The general information given by Dr. Leo, although undoubtedly the result of extensive, published research, did not present any theory or methodology that could be tested or otherwise scrutinized for reliability in his field of criminology. As another court concluded, Dr. Leo's false confession theory is new and unrefined and needs further study. See Vent v. State (Alaska App. 2003), 67 P.3d 661, 670. Dr. Leo's theory has too many unanswered questions and, therefore, fails to support any reliable conclusions. Id. The trial court reasonably concluded that Dr. Leo's testimony was not scientifically reliable under the Daubert factors and, therefore, failed to satisfy Evid. R. 702(C). *Page 9 
 Assistance to Jury {¶ 25} The trial court further found that Dr. Leo's testimony should not be admitted as expert testimony under Evid. R. 702 because it would not assist the jury in understanding matters beyond their knowledge as lay people. See Evid. R. 702(A).
 {¶ 26} As explained above, Dr. Leo conceded that he could not predict when a confession was false, nor could he opine that coercive interrogation tactics are more likely to yield false confessions instead of truthful ones. Dr. Leo could not offer an opinion on which interrogation techniques lead to false confessions, he had no information about the percentage of confessions that are truthful or false, nor could he analyze a given confession and offer an opinion as to whether it was true or false.
 {¶ 27} Dr. Leo could offer no expert insight into any of the circumstances surrounding Wooden's confession and the likelihood that any of those circumstances led to a false confession. Dr. Leo's proposed testimony was not directly relevant to the reliability of the defendant's confession, such as a psychological expert who could offer insight into a defendant's mental state to explain the likelihood that a mentally ill or mentally retarded defendant falsely confessed to a crime. See, e.g., State v. Southerland, 10th Dist. No. 06AP-11,2007-Ohio-379.
 {¶ 28} It was not beyond the knowledge of lay jurors that coercive police interrogation tactics might be more likely to induce a confession from a criminal suspect, nor was the fact that suspects do sometimes falsely confess to a crime. As another court observed on this issue, Dr. Leo's testimony is based on nothing more than common sense insofar as it would assist the jury in assessing the reliability of the confession. See Vent, 67 P.3d at 672 (Mannheimer, J., concurring). His techniques "amounted to nothing more than testing the details of the confession *Page 10 
against the known facts." Id. Lay jurors have the ability to make such an assessment of the evidence based on their own knowledge and experience.
 {¶ 29} Since most of the interrogation of Wooden was recorded either by audiotape or videotape, the jury could assess the interrogation tactics used by the police during their interrogation of Wooden. The jury could observe the circumstances surrounding Wooden's confession and assess reliability on its own. Dr. Leo's testimony would not offer the jurors any insight outside their own knowledge and experience and, therefore, failed to satisfy Evid. R. 702(A).
 {¶ 30} Given the evidence before the trial court that Dr. Leo's expert testimony did not include a reliable scientific theory or anything outside the understanding of the jury that would assist it in assessing the reliability of Wooden's confession, the trial court did not abuse its discretion in refusing to admit Dr. Leo's testimony. Wooden's second assignment of error is overruled.
 III. {¶ 31} The assignments of error are overruled and the judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27. *Page 11 
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
 SLABY, J., WHITMORE, J., CONCUR. *Page 1