PARRO, J.
 

 | /fhe defendant, Louis Lamonica, was charged by grand jury indictment with one count of aggravated rape of M.L. from January 1, 1992, to December 31, 1992 (count 1); one count of aggravated rape of M.L. from January 1, 1994, to December 31, 1994 (count 2); one count of aggravated rape of S.L. from January 1, 1999, to December 31, 1999 (count 3); and one count of aggravated rape of S.L. from January 1, 2000, to December 31, 2000 (count 4), all violations of LSA-R.S. 14:42. The defendant pled not guilty to the charges and, following a jury trial, was found guilty as charged on all counts. On each count, he was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, with the sentences to run concurrently. The defendant now appeals, designating one assignment of error. We affirm the convictions and sentences.
 

 FACTS
 

 The defendant was the father of two sons, M.L., born July 27, 1986, and S.L, born April 10, 1990. At the time of the alleged offenses, the defendant was the pastor of Hosanna Church (formerly The First Assembly of God Church) on Louisiana Highway 51 in Tangipahoa Parish. The defendant’s wife, R.L., and his sons were members of the church. In the late 1990s, Lois Mowbray became associate pastor of Hosanna Church, and in 2001, she became co-pastor of the church. By 2003, the defendant’s involvement in the church, including his involvement as a preacher, declined considerably. Lois, along with her husband, Jesse Mowbray, and R.L., began handling the finances of the church. According to the defendant, Lois began to take over as the person running the church.
 

 In 2002, the defendant and R.L. began having marital problems. In March of 2003, the defendant separated from R.L. and began living at the church. For the
 
 *897
 
 next two years, the defendant lived at the church.
 

 In 2002 or 2008, Dr. Milton Anderson, a psychiatrist, began treating M.L. and S.L. Dr. Anderson saw the boys on a regular basis for medication management and |.-¡general supportive therapy. Both boys had A.D.H.D., anxiety, and Tourette’s syndrome. In March 2005, R.L. contacted Dr. Anderson and told him it was urgent that he see the boys. Over the course of two sessions, M.L. and S.L. revealed to Dr. Anderson that for years they had been forced to have sex with adults, a very young girl (A.B.), and each other. S.L. also had a stack of pictures he had drawn graphically illustrating the abúse he and his brother had suffered. According to M.L. and S.L., they were threatened by church member N.B. to disclose to Dr. Anderson all of the sexual incidents in which they were involved.
 
 [1]
 
 As a result of these sessions, Dr. Anderson contacted Child Protective Services. According to Thomas Tedder, an FBI Special Agent working on the case, when the defendant and Bernard, as well as some other adult church members, began living at the church, there were no longer any church services and the building had, in effect, ceased functioning as a church.
 

 In late March 2005, Dr. Adrienne At-zemis, a pediatric forensic medicine specialist, saw M.L. and S.L. for therapy. Dr. Atzemis also performed a full physical examination on each boy. Dr. Atzemis testified at trial that M.L. and S.L. told her that they were forced to perform sexual acts on the defendant and others. M.L. said he had oral and anal sex with the defendant at home and at the church. S.L. also said he had oral and anal sex with the defendant.
 

 In April 2005, Jennifer Thomas, a forensic interviewer with the Child Advocacy Center (CAC), interviewed M.L. and S.L. in Hammond. At trial, Thomas indicated that M.L. was eighteen years old when he was interviewed and, as such, his interview could not be used in court. The videotaped interview of S.L., who was almost fifteen years old at the time, was played for the jury. In the interview, S.L. listed at least half a dozen adult church members, including the defendant, who took part in the sexual abuse. According to S.L., sexual incidents occurred at his Lhouse, Bernard’s house, and the church. S.L. told Thomas that he also had sex with a dog and with A.B., who was about one year old. S.L. and Thomas also went over S.L.’s drawings of various sexual acts involving certain people, including himself, M.L., and the defendant. S.L. indicated to Thomas that some of his drawings depicted actual events, while other drawings were products of his imagination or based on what he and the defendant talked about. According to S.L., of about 55 drawings, approximately 22 of them depicted actual events involving sex.
 

 In July and August 2005, S.L. had several therapy sessions with Dr. Allison McCain, a clinical psychologist. Dr. McCain testified at trial that she found S.L. to have a lot of depression, some anxiety and guilt, and feelings of worthlessness. S.L. told Dr. McCain that he tried to cope with his feelings with distraction and repression. S.L. told Dr. McCain that he had been using these coping mechanisms for years to try to not think about the molestation. S.L. also indicated that,
 
 *898
 
 after his parents separated, the molestation stopped.
 

 In May 2005, the defendant walked into the Livingston Parish Sheriffs Office and asked to speak to Detective Bonita Sager. In a taped interview with Detective Sager, the defendant confessed to raping his sons. The defendant stated that at his home in Springfield (Livingston Parish) he performed oral sex on M.L. when he was four or five years old. The defendant began having anal sex with both M.L. and S.L. when they were five or six years old. The defendant further indicated that sexual activity involving several people, including A.B., occurred at Hosanna Church. Based on this information, Detective Sager contacted the Tangipahoa Parish Sheriffs Office. Detective Reginald Bryant with the Tangipahoa Parish Sheriffs Office met with Detective Sager in Livingston Parish and Detective Sager interviewed the defendant for a second time on the same day. In this second interview, the defendant provided detailed accounts of various sexual encounters at the church. He described orgies at the church involving his sons, A.B., and Jateen aged members of the church all having sex with several adult members of the church, including the defendant. The defendant stated that most of the time he had sex with his sons at home, but that he had sex with them at the church, as well. The defendant did not mention Lois Mowbray in either of his statements to the police.
 

 Police searched the defendant’s house and found a notebook containing writings by the defendant. Handwritten by the defendant ostensibly in 2004, these pages detailed the repeated instances of his orally and anally raping M.L. and S.L. The defendant wrote about having sex with his dog, forcing his sons to have sex with each other, and raping S.L., starting from the age of three up until the age of twelve. The defendant wrote that he used money, toys, threats, and physical abuse to control and rape his sons.
 

 In late 2005, Dr. Angela Mayfield, owner of New Beginnings Behavioral Healthcare in Hammond, began counseling S.L. S.L. told Dr. Mayfield that his father, mother, and other people at church sexually molested him. The defendant and R.L. (his wife) were in jail when S.L. was being treated by Dr. Mayfield, so S.L. lived with his grandmother, the defendant’s mother. Dr. Mayfield testified at trial that, within two months of moving in with his grandmother, S.L. changed his account of his being sexually abused. S.L. told Dr. May-field that he made up all of the allegations of abuse, and that someone at the church had forced him to say that he was abused and molested. Dr. Mayfield testified that in late 2005 or early 2006, S.L. said he “made it all up,” but that, despite his recantation, she continued to treat him until September 2007 because he still had problems. Dr. Mayfield testified that after S.L. recanted, he still had the symptoms that were consistent with his history of sexual abuse. Dr. Mayfield felt S.L.’s symptoms, in fact, got worse, and S.L. began using illegal drugs.
 

 M.L. and S.L. testified at trial. They both had written about the sexual abuse that occurred, and S.L. had drawn pictures of the abuse. They both claimed at | fitrial, however, that the sexual abuse had never occurred and that they were forced by N.B. to make these false allegations. They also both claimed that all of the allegations of sexual abuse they had written about were not true and that their mother told them what to write. M.L. stated that N.B. also told him what to write. S.L. stated that Lois Mowbray also told him what to write, as well as to draw the pictures. M.L. explained that N.B. told him that if he did not come forward
 
 *899
 
 with the allegations of sexual abuse, including the abuse to her daughter, A.B., N.B. would press charges against him, and he would go to jail.
 

 The defendant testified at trial that none of the sexual allegations he had confessed to or written about were true. He testified that when he was the pastor of the church, he made Lois Mowbray his spiritual advisor, that R.L. and Lois were “very close,” and that they were close to N.B. He believed that Lois was a prophet and spoke to God. The defendant claimed that he made these false confessions because Lois had control over him and forced him to speak and write about things he never actually did, but may have thought about. According to the defendant, the notion of “spiritual thought” preached by Lois meant that if you think something, then it happened. The defendant claimed that R.L. also made him write about sexual acts that never occurred and that, if he did not write as instructed, she would divorce him and he would never see his sons.
 

 In his testimony, the defendant suggested that Lois made him remain at the church and work very long hours each day, with little sleep, for no money at Integrity Electric, a business operating within the church. He also had to do work cleaning the church. According to the defendant, he was told the money he earned was being sent to his family. The defendant claimed that the room in which he was staying inside the church was locked at night from the outside with padlocks to ensure he was locked in.
 

 The defendant testified that other members of the church hit him. He also claimed that they shaved his head and made him wear a dress and two snakes |7(presumably rubber toy snakes) while he worked. R.L. saw the defendant dressed this way, and it made him feel “very small.”
 

 The defendant claimed that Lois did not allow him to see his wife and sons and that, if he confessed and wrote about the sexual abuse that never occurred, Lois would allow him to go home to his family. Also, the defendant claimed that Lois told him to go to the police and to confess about the church cult involving sexual abuse of children and Satanic rituals. He further claimed that Lois told him that he would have to ask the police for a deal, and that he would “walk out” of the police station.
 

 Karen Bushey, who was twenty-four years old, testified at trial that she was a member of the Hosanna Church youth group for several years when she was a teenager. She testified that she told the FBI and the police there was no cult activity at the church. She never saw any children being molested, animal sacrifices, or Satanic rituals. She also told them she was never forced to have sex. Karen described it as a “church cult” only in the sense that Lois basically had control over everything and controlled what everyone did. On cross-examination, Karen testified that, while Lois had control of everything, Lois never convinced Karen that she had had sex with the defendant, or to write about or draw pictures of sexual abuse of herself or anyone else.
 

 Desiree’ Louque, who was twenty-three years old, testified at trial that she was a member of the Hosanna Church youth group for several years when she was a teenager. She testified that she told the FBI and the police that she was never forced to have sex with anyone at the church. She also told them there were no Satanic rituals or a cult involving sexual abuse of children at the church. Desiree’ further testified that no one at the church ever asked her to write about having sex with people she never had sex with, or draw any pictures of sexual activity.
 

 
 *900
 
 | «ASSIGNMENT OF ERROR
 

 In his sole assignment of error, the defendant argues the trial court erred by excluding the testimony of his expert witness, which denied him his constitutional right to a meaningful opportunity to present a complete defense. Specifically, the defendant contends that his expert witness, Dr. Richard Ofshe, should have been allowed to testify at trial about false confessions and the influence of high-control groups or cults.
 

 Preliminary questions concerning the competency or qualification of a person to be a witness or the admissibility of evidence shall be determined by the court. LSA-C.E. art. 104(A). Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. LSA-C.E. art. 403. The trial court is vested with wide discretion in determining the competency of an expert witness, and its ruling on the qualification of the witness will not be disturbed absent an abuse of discretion.
 
 State v. Trahan,
 
 576 So.2d 1, 8 (La.1990).
 

 Louisiana Code of Evidence article 702 dictates the admissibility of expert testimony and provides:
 

 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 

 See State v. Higgins, 03-1980
 
 (La.4/1/05), 898 So.2d 1219,
 
 1239, cert. denied,
 
 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). Notably, the supreme court has placed limitations on this codal provision in that, “[ejxpert testimony, while not limited to matters of science, art or skill, cannot invade the field of common knowledge, experience and education of men.”
 
 State v. Stucke,
 
 419 So.2d 939, 945 (La.1982);
 
 see State v. Young,
 
 09-1177 (La.4/5/10), 35 So.3d 1042, 1046-47.
 

 In
 
 State v. Foret,
 
 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test set forth in
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding proper standards for the admissibility of expert scientific testimony, which requires the trial court to act in a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.
 
 State v. Chauvin,
 
 02-1188 (La.5/20/03), 846 So.2d 697, 701. To assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, the United States Supreme Court suggested the following general observations are appropriate: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the methodology is generally accepted by the relevant scientific community.
 
 Daubert,
 
 509 U.S. at 592-94, 113 S.Ct. 2786. Thus, Louisiana has adopted
 
 Daubert’s
 
 requirement that in order for technical or scientific expert testimony to be admissible under LSA-C.E. art. 702, the scientific evidence must rise to a threshold level of reliability.
 
 Dau-bert’s
 
 general “gatekeeping” applies not only to testimony based upon scientific knowledge, but also to testimony based on “technical” and “other specialized knowledge.”
 
 Kumho Tire Co., Ltd. v. Carmichael,
 
 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999);
 
 Independent Fire Ins. Co. v. Sunbeam Corp.,
 
 99-2181 (La.2/29/00), 755 So.2d 226, 234. The trial
 
 *901
 
 court may consider one or more of the four
 
 Daubert
 
 factors, but that list of factors neither necessarily nor exclusively applies to all experts or in every case.
 
 Kumho,
 
 526 U.S. at 141, 119 S.Ct. 1167. Rather, the law grants a trial court the same broad latitude when it decides how to determine reliability as it enjoys with respect to its ultimate reliability determinations.
 
 Kumho,
 
 526 U.S. at 142, 119 S.Ct. 1167. The purpose of a
 
 Daubert
 
 hearing is to determine the reliability of an expert’s methodology, not whether the |inexpert has the proper qualifications to testify.
 
 Cheairs v. State ex rel. Dep’t of Transp. & Dev.,
 
 03-0680 (La.12/3/03), 861 So.2d 536, 541;
 
 see State v. Vidrine,
 
 08-1059 (La.App. 3rd Cir.4/29/09), 9 So.3d 1095, 1106-07,
 
 writ denied,
 
 09-1179 (La.2/26/10), 28 So.3d 268.
 

 At the conclusion of the defendant’s testimony, the defense called Dr. Richard Ofshe, a sociology professor at the University of California at Berkeley. Dr. Ofshe testified his area of concentration was social psychology. In the last thirty years, his work had been focused on three areas. The first area of focus was high-control organizations, or cult groups, and how they manipulate people into doing things. He also focused on interrogation and confession, a setting built to influence people to do something extraordinary. His third area of focus, unrelated to this case, was on the misuse of influence in psychotherapy. Dr. Ofshe described the type of research he had performed in these areas, such as interviews, archival research, studying transcripts, videotapes,' and audiotapes of interrogations, and studying records of high-control groups. With respect to these three areas of study, Dr. Ofshe testified he had written seven or eight books and about fifty articles. Also, his work had been accepted by his peers. He stated he was not licensed because he was not a clinician, and what he did professionally did not require licensure. He stated over the years he had been a consultant for law enforcement agencies in several states and cities. Regarding all of his areas of study, Dr. Ofshe testified as an expert witness 341 times in more than thirty-four states. On the subject of interrogation, he testified as an expert witness 308 times in thirty-four states, including Louisiana. Dr. Ofshe’s preparation for the instant case involved reviewing numerous documents. He stated that his anticipated testimony for the instant case would be on what it is that can lead someone to give a false confession and on the nature and structure of the mechanisms of influence that are used in high-control groups. He further stated he did not intend to offer testimony as to whether statements made by the defendant were true or false. InDefense counsel tendered Dr. Ofshe as an expert in the field of false confessions and influence in high-control organizations.
 

 The prosecutor cross-examined Dr. Ofshe on his qualifications as an expert witness. The prosecutor asked Dr. Ofshe about several published decisions where Dr. Ofshe was either limited in his testimony or not allowed to testify about false confessions. At the conclusion of the cross-examination, a sidebar conference was held at the bench. The prosecutor challenged the legitimacy of the science of false confessions and influence of high-control groups. The trial court retired the jury and conducted a
 
 Daubert
 
 hearing.
 

 At the conclusion of the
 
 Daubert
 
 hearing, the trial court ruled that Dr. Ofshe’s testimony was inadmissible, stating:
 

 First of all, Dr. Ofshe, I do believe that you are an expert in the field. I believe that this is a new field. The problem that I have with it is I don’t know how it aids the jury. The jury has heard testimony, not only — not from Mr. Lamoni-ca, but from [M.L.] and [S.L.] They have
 
 *902
 
 heard Mr. Lamonica’s allegations that he suffered a deprivation of freedom, that he was forced to wear a dress, and snakes, and they were chanting, that people ostracized him, gave him a new name, he had forced labor at a bunch of these companies for ten dollars ... a week. And if the jury believes these allegations, if they believe that those are true, then, certainly they wouldn’t question whether or not the confession is false or not. They could, on their own, figure that if a person was truly subjected to this type of stress and this treatment, then, certainly they would do whatever it was they could do to get themselves out of it. As far as are there false confessions, I don’t think there’s anybody that believes that there are not false confessions. The example that you gave about false confessions given by persons with feelings of grandiosity, they want to make themselves-the notoriety, they want to make themselves get their fifteen minutes of fame, or whatever, I think that’s true, too. I think that’s very true. But I don’t think that that’s something that they need an expert to tell them. And if I’m wrong, I’m wrong. But I have to do what I think is right. Therefore, I’m going to exclude your testimony.
 

 We find no reason to disturb the trial court’s ruling. At the
 
 Daubert
 
 hearing, Dr. Ofshe testified that for the past fifteen years or so, the area he had been researching and writing about was confessions. Dr. Ofshe explained at the hearing that there were two types of false confessions, namely, voluntary and interrogation-driven. The interrogation-driven false confession would arise during |12an interrogation where a subject is accused of committing a crime.
 
 [2]
 
 A voluntary false confession is not interrogation-driven. Such a confession can occur because of pressure brought on an individual by his environment, including a high-control group, to do something.
 

 In the instant matter, there was no interrogation-driven confession. The defendant simply entered the police station on his own accord, without having been summoned, and told the police what he had done to his sons and others. Thus, the type of false confession applicable to this case, for purposes of discussion by Dr. Ofshe, would have been a voluntary false confession. Accordingly, it would seem that much of what Dr. Ofshe discussed at the
 
 Daubert
 
 hearing, namely, interrogation-driven false confessions, would have little relevancy to this case. Clearly, Dr. Ofshe’s current area of focus was on interrogation-driven confessions, as indicated by his discussions of
 
 U.S. v. Hall
 
 and the “West Memphis Three” case. In fact, Dr. Ofshe testified at the
 
 Daubert
 
 hearing that he no longer studied the area of influence of high-control groups. After a discussion on interrogation techniques that cause false confessions, the following colloquy between defense counsel and Dr. Ofshe took place:
 

 Q. Now, the same question as it relates to influence of high-control groups?
 

 A. I don’t know what standing is in that. There was a time when I worked more extensively in that area, I was more active in that area. But I shifted my focus to interrogation, and really don’t do much these days with respect to
 
 *903
 
 that. So, what my status is there, I don’t know.
 

 Q. All right. But the criteria that you will now find with respect to the definition of high-control groups or components of high-control groups would remain the same; is that correct?
 

 A. Oh, sure. It’s just — I don’t know what people, you know — since I don’t work in the area actively, you know, these days, I have no idea what people think of the work that I haven’t been doing, basically. | lsDr. Ofshe noted, however, that he had worked in that area in the past and had been recognized as an expert.
 

 Later in the
 
 Dcmbert
 
 hearing when the prosecutor asked Dr. Ofshe if he was no longer working in the area of high-control techniques, Dr. Ofshe responded, “I’m not actively involved in researching in that area. All of my effort goes to the subject of interrogation these days.” Dr. Ofshe continued that he had not been doing research in the area of high-control techniques for more than ten years. When asked by the prosecutor how long it had been since he was qualified and allowed to testify in the area of high-control techniques by any religious or other cult, Dr. Ofshe responded that it had been as much as ten years ago.
 

 When asked about the methodology he used with respect to false confessions and to the influence of high-control groups, Dr. Ofshe responded that it consisted of observations of confessions and interviews of those who gave a false confession or were involved in high-control groups. He also stated that the testimony he was going to give was based on what had been observed in high-control groups. Dr. Ofshe further explained that he did not use laboratory studies because his conclusions were “based on the study of real interrogations in the real world.”
 

 When asked if an error rate was applicable in his field, Dr. Ofshe responded that error rate was only applicable if a number was involved. He explained, “What I’m talking about does not get to the point of saying the probability is such and such that this will happen.” Therefore, the “mention of error rate is premature.” Dr. Ofshe further explained that error rates were appropriate for techniques and that he would not be testifying about applying a particular technique.
 

 On the testability of false confession theory, the following colloquy between the prosecutor and Dr. Ofshe took place:
 

 Q. How can you test that, short of examining cases where it happened?
 

 | mA. Test what? I don’t understand your question.
 

 Q. Your conclusions that certain techniques might lead to false confessions. A. Well, one way to test that — one way to demonstrate that is to look at false confession cases and find out what it is that led to that. And know, for example, that false confession is, if not the number one, the number two, leading cause of miscarriages of justice from all the studies that have been done of miscarriages of justice. We don’t know how often it happens; but we do know that it is a major contributor to the American criminal justice system reaching the wrong result.
 

 Q. But it’s impossible to test how often or whether a particular — in a particular case your theory works?
 

 A. No. It’s not impossible to test it. It’s prohibitively expensive and prohibitively laborious, even assuming you could do it. It would take a methodology that is not worth the effort. The methodology that’s used within the social sciences is to look at established, proven cases in which miscarriages have oc
 
 *904
 
 curred, study what happened in those cases, and therefore isolate the power of false confession to produce a miscarriage of justice. That doesn’t tell us how many miscarriages happen annually and it doesn’t tell us how many false confessions happened annually. But it does tell us that false confession is a major contributor to innocent people going to prison.
 

 There is little case law in Louisiana on false confessions in a police interrogation setting. There is no known case law in this state on false confessions in the context of high-control groups, rather than coercive police interrogation. The law in other jurisdictions suggests that there is support both for and against the admissibility of expert testimony on false confessions. Various courts have found it inappropriate to admit this testimony.
 
 See, e.g., United States v. Griffin,
 
 50 M.J. 278, 285 (U.S.A.F.1999);
 
 State v. Cobb,
 
 30 Kan. App.2d 544, 43 P.3d 855, 869 (2002);
 
 State v. Tellier,
 
 526 A.2d 941, 944 (Me.1987);
 
 State v. Davis,
 
 32 S.W.3d 603, 608-09 (Mo.App.2000);
 
 State v. Free,
 
 351 N.J.Super. 203, 798 A.2d 83, 95-96 (2002);
 
 Green v. State,
 
 55 S.W.3d 633, 640 (Tex.App.2001),
 
 cert. denied,
 
 535 U.S. 958, 122 S.Ct. 1366, 152 L.Ed.2d 360 (2002);
 
 see also Vent v. State,
 
 67 P.3d 661, 669 n. 37 (Alaska App. 2003). Other courts have permitted expert testimony on false confessions.
 
 See, e.g., United States v. Shay,
 
 57 F.3d 126,132-34 (1st Cir.1995);
 
 Callis v. State,
 
 684 N.E.2d 233, 239 (Ind.App.1997);
 
 State v. Buechler,
 
 253 Neb. 727, 572 N.W.2d 65, 72-74 (1998);
 
 State v. Baldwin,
 
 125 N.C.App. 530, 482 S.E.2d 1, 5 (1997);
 
 see also Vent,
 
 67 P.3d at 669 n. 36.
 

 Of the aforementioned cases that have upheld the admissibility of expert testimony on false confessions, all are concerned with false confessions in a police interrogation setting. None of the cases are about voluntary false confessions allegedly caused by the internal and/or external pressures of a high-control group, which is the issue in the instant matter, insofar as Dr. Ofshe’s testimony is concerned. Based on some of the testimony from Dr. Ofshe at the
 
 Daubert
 
 hearing, it appears to this court that, had he been allowed to testify, he would likely have, or would have come exceedingly close to having, testified to the ultimate issue of the case. The testimony is troubling because it appeared to assume two unresolved issues as facts, which would have invaded the province of the jury as factfinder. The first issue was whether the group of church members could even be defined as a “high-control group.” The second issue was whether the defendant falsely confessed or truthfully confessed. In the following colloquy where the prosecutor asks Dr. Ofshe what he could add to the jury’s understanding, Dr. Ofshe seemed to have predetermined that the church members were a high-control group and that the defendant falsely confessed:
 

 Q. Mr. Thiel [defense counsel], a minute ago, ran through a long list of circumstances that might affect one’s ability to make a voluntary confession. You know, being kept up all night; being occasionally beaten, not by the police but by others; made to wear a dress; and all these other things. He’s already brought all of that out to the jury. So, what assistance can you give a jury on factors that he’s already brought before the jury ... that these are factors that affected his ability to make a confession or a false confession? How can you go beyond that?
 

 A. By educating the jury as to how these kinds of techniques, when organized ... have in the past elicited extremes of conduct; not only false confessions, but literally murders, repeatedly, as well as extremes of conduct based on
 
 *905
 
 the applications of these techniques. There are—
 

 Q. Well, he’s already brought out the techniques and he’s already told the jury what it led to. In other words, his walking in and making a confession that wasn’t true. What do you have to add beyond that?
 

 |1fiA. That these techniques are routinely used, routinely observed, in situations in which people are gotten to engage in extremes of conduct [ — ] far more extreme than what Mr. Lamoni[c]a did. That these are very powerful techniques .... Illustrate that this is not just a laundry list. Illustrate that these things have a tremendous impact, and that it is not unique to what’s going on in this courtroom.
 

 Q. Well, if it’s — if it doesn’t have anything to do with what’s going on in this courtroom, it’s not relevant to this case, is it?
 

 A. I didn’t say it wasn’t — it didn’t have anything to do with it. I said,
 
 Its not unique.
 
 Meaning that these similar kinds of things, which are at issue in this courtroom, are not unique to this courtroom, but in fact have been observed repeatedly in other situations in which people have done things that are extraordinary, and apparently incomprehensible, until you come to appreciate the power of the techniques being used to manipulate them....
 

 ⅜ ⅜ ⅝ ⅝ ⅜ ⅜
 

 Q. I’m not claiming to be an expert, sir; you are. What techniques do you intend to testify about, that were used in this case, that will help this jury decide whether his confession should be considered valid by them or not?
 

 A. Well, first of all, there are at least three separate statements that need to be considered by this jury. There are the statements made by Mr. Lamoni[c]a, and there are also the statements made by his children. All of them were produced out of particular social settings. Mr. Lamonica, perhaps, was exposed ... to the most extreme of these by his being isolated from his normal social context, isolated from his family, isolated from his children; threatened with loss of his family, threatened with loss of his children; manipulated in his economic life by becoming an employee of an organization; controlled by the group; by being subjected to a variety of particular pressure sessions that were designed to get him to comply and admit the things that he had been previously saying he simply had not done, he had in fact done. These pressures were brought to bear on him to get him to do that, in the context of the group, long before this came to the attention of the police. He was manipulated over a long period of time. He was harangued. He was assaulted. He was essentially kept prisoner by the threat that if he left he would lose his children. All of these techniques, I can show you, are used in other groups in which otherwise law-abi[d]ing people go out and commit crimes, because ultimately the leader of the group demands that of them.
 

 * # # ⅜ # ⅝:
 

 Q. Now, Doctor, you just went through all these fact circumstances, all these things that happened to this man. He’s already testified to that. What do you got to add to that?
 

 A. An understanding for the jury that what he’s talking about is not unique to him. That what he’s talking about is understood by people who study this area. That what he’s talking about are the kinds of things that appear in other well researched groups that lead to ex
 
 *906
 
 traordinary behavior [ — ] behavior far more extraordinary than simply walking into a police station and giving a confession, repeating a confession that you’ve given before, with the promise that this will' have no negative consequences for you[,] that you will get a deal. [ 17So, when you start analyzing the circumstances under which he first gave these statements, and you understand the setting in which this happens and you understand the significance of it, then you are in a position to judge how seriously to take it. If you then understand how that’s easily extended to get somebody to walk in and repeat, essentially, the same confessions to agents of the state, when they have been promised that they will receive absolute leniency, they will receive no punishment if they do this, and they will be able to rejoin their family, if you begin to apply that context to -it, an understanding of what’s really going on, then perhaps you’re in a better position to make a judgment about what weight to give his statements. Then, the same things can be applied to the circumstances under which the initial, now repudiated, statements of his children were elicited. That’s what the jury has to decide. The jury, I would think, has to appreciate the totality of the circumstances that led to all three of the statements at issue.
 

 * * * * * ⅜
 

 Q. So, the correlation you’re going to draw between the facts that have already been presented, and whether the jury should believe him is what?
 

 A. I’m not going to draw that correlation. I’m simply going to show the jury that the circumstances that have been testified to about his manipulation, and the manipulation of his children, are circumstances that appear elsewhere and are correlated when they appear elsewhere with other kinds of extreme conduct. Then it’s up to the jury to evaluate that.
 

 Q. Basically, you’re telling the jury, though, that when these types of things occur, the confession cannot be reliable?
 

 A. I’m not telling them that.
 

 Q. Well, essentially, you are. You — •
 

 A. Ami?
 

 Q. —may not think you so [sic]. But that’s the way it sounds to me.
 

 A. Well, that’s because you don’t like that possibility. But I’m not—
 

 Q. Well, I don’t—
 

 A. —telling them that.
 

 Dr. Ofshe’s testimony at the
 
 Daubert
 
 hearing suggested that there was no methodology about false confessions that could be tested, or that would permit an error rate to be determined. In this area of research, the result of the lack of any reliable testing format to establish predictors of when a false confession might occur is a methodology consisting of analyzing false confessions only after a confession has been determined to be false. While we appreciate the ostensible | ^validity of the research area of false confessions in a police interrogation setting, we find the area of research on false confessions caused by high-control groups to be vague and speculative, at best, and such research does not satisfy the standard of
 
 Daubert,
 
 particularly in light of the fact that Dr. Ofshe had not studied or worked on any cases in this particular area for more than ten years.
 
 See Tellier,
 
 526 A.2d at 944. Such testimony at trial by Dr. Ofshe of high-control groups and how they can cause people to do extraordinary things they would not normally do, including murder, would have had little, if any, relevance or probative value and would have added nothing to enhance the jury’s
 
 *907
 
 understanding of the facts, but would only have confused the issues.
 

 The trial court did not err in finding Dr. Ofshe’s proposed trial testimony inadmissible under
 
 Daubert.
 
 Accordingly, the assignment of error is without merit.
 

 CONVICTIONS AND SENTENCES AFFIRMED.
 

 [1]
 

 . N.B. was the mother of A.B. and the wife of Trey Bernard, who was also living at the church because of marital problems.
 
 See State v. Bernard,
 
 08-1322 (La.App. 1st Cir.2/13/09) (unpublished opinion), 5 So.3d 317 (table),
 
 writ denied,
 
 09-0680 (La. 12/11/09), 23 So.3d 910.
 

 [2]
 

 . Dr. Ofshe discussed
 
 U.S. v. Hall,
 
 93 F.3d 1337 (7th Cir.1996), where Dr. Ofshe's expert testimony on false confessions was accepted by the court. In
 
 1-Iall,
 
 the defendant was allegedly coerced by police to falsely confess. Dr. Ofshe also discussed the "West Memphis Three" case, where one of the suspects for murder was allegedly coerced by the police into making a false confession.