MARKMAN, J.
(concurring in part and dissenting in part). I agree with the lead opinion that (a) the trial court did not abuse its discretion by ruling that Dr. Richard Leo’s proffered expert testimony regarding the existence of false confessions and the interrogation techniques claimed to generate them is unreliable and thus inadmissible under MRE 702, (b) for the same reason, to the extent that Dr. Jeffrey Wendt’s proffered testimony relied on Leo’s false confession testimony, the trial court did not abuse its discretion by excluding this testimony, and (c) the exclusion of this testimony did not violate defendant’s Sixth Amendment right to present a defense. However, I respectfully disagree with the lead opinion’s conclusions that (a) expert testimony regarding the existence of false confessions, even if reliable, is admissible under MRE 702 because it is beyond the common knowledge of the average juror and (b) Wendt’s testimony concerning defendant’s psychological characteristics, even if reliable, is relevant and thus admissible under MRE 702. Instead, I conclude that (a) expert testimony regarding the existence of false confessions is not beyond the common knowledge of the average juror and thus is inadmissible under MRE 702 and (b) Wendt’s testimony concerning defendant’s psychological characteristics is irrelevant because, as Wendt himself admits, none of these characteristics make it “more probable or less probable,” MRE 401, that defendant’s confession was either true or *147 false, and thus his testimony is also inadmissible under MRE 702. In other words, I conclude that the trial court did not abuse its discretion by excluding Leo’s and Wendt’s proffered testimony. Accordingly, I would affirm the judgment of the Court of Appeals.
I. SUMMATION
The issue in this case is not whether defendants may sometimes falsely confess. Indeed, it is precisely because this possibility is so obvious that it can hardly be said to be “beyond the common knowledge of the average juror” and thus an appropriate subject of “expert” testimony under the law. Moreover, there is nothing offered in this case by the asserted “experts” on false confessions that would afford jurors any actual assistance in determining whether defendant’s confession was, in fact, false. The police interrogation techniques Leo identified as being associated with false confessions were acknowledged by Leo as also being associated with true confessions, and the psychological traits Wendt identified as evidence of a possible false confessor were acknowledged by Wendt as also being traits that might be possessed by nonfalse confessors. Thus, neither expert’s proposed testimony is relevant in any way to the jury in deciding whether defendant was a false confessor or a nonfalse confessor. It is hard to think of a function more central to the traditional jury role than to ascertain the credibility of ordinary witnesses and other persons. To introduce into the jury process “expert” witnesses who will testify that persons will sometimes falsely confess is to belabor the obvious and create the illusion that there is some “scientific, technical, or other specialized knowledge” that will assist the jury in carrying out its core responsibility of determining credibility. Thus, the introduction of “ex *148 perts” into the realm of the mundane does not merely risk distracting the jury, but risks the prospect of jurors increasingly subordinating their own commonsense judgments — precisely the kind of judgments that form the rationale for the jury system in the first place — to the false appearance of expertise suggested by the presence of expert psychological testimony. The criminal trial of the near future in Michigan, one being nudged forward by today’s decision, is one in which: (a) increasing numbers of criminal defendants will as a matter of routine employ “expert” witnesses to attempt to dispel the trustworthiness of their confessions, (b) increasing numbers of criminal defendants will be encouraged not to testify on their own behalf that they falsely confessed, preferring to let the jury infer this same conclusion from the testimony of “experts,” (c) prosecutors will be increasingly incentivized to respond to testimony by defendants’ “experts” that false confessions sometimes occur with testimony by their own “experts” that truthful confessions sometimes also occur and that, in fact, truthful confessions tend to occur more often than false confessions, with defendants’ “experts” then responding that, while that may all be true, false confessions nonetheless occur more often than acknowledged by the prosecutors’ “experts,” (d) ordinary issues of credibility traditionally resolved by juries through the exercise of their own common sense, judgment, and experience will increasingly become the subject of battling contingents of “experts,” and (e) increasingly frequent and distracting courtroom debates will take place concerning other unremarkable propositions of human behavior such as that memories fade over time, police officers sometimes testify falsely, and persons who do not look others in the eye may sometimes be testifying dishonestly. As a result, and for no good reason, the criminal trial of the near future will *149 be slightly more prolonged, slightly more costly for all parties, and ever slightly more open to the kind of gamesmanship that distracts the criminal trial from its principal mission, the search for the truth.
II. STANDARD OF REVIEW
This Court reviews a trial court’s decision to exclude expert testimony for an abuse of discretion. Edry v Adelman, 486 Mich 634, 639; 786 NW2d 567 (2010). A trial court abuses its discretion when it “chooses an outcome falling outside [the] principled range of outcomes.” People v Babcock, 469 Mich 247, 269; 666 NW2d 231 (2003).
III. ANALYSIS
MRE 702 governs the admissibility of expert witness testimony and provides:
If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
MRE 702 requires expert testimony to be both reliable and relevant. See Daubert v Merrell Dow Pharm, Inc, 509 US 579, 597; 113 S Ct 2786; 125 L Ed 2d 469 (1993) (“[T]he Rules of Evidence — especially Rule 702 — do assign to the trial judge the task of ensuring that an expert’s testimony both rests on a reliable foundation and is relevant to the task at hand.”); Kumho Tire Co, Ltd v Carmichael, 526 US 137, 141; 119 S Ct 1167; 143 *150 L Ed 2d 238 (1999) (“[Scientific expert testimony... is admissible only if it is both relevant and rehable.”); Gilbert v DaimlerChrysler Corp, 470 Mich 749, 780 n 46; 685 NW2d 391 (2004), quoting Daubert, 509 US at 589 (“ ‘[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.’ ”) (emphasis omitted).
A. TESTIMONY OF DR. LEO
I do not believe that the trial court abused its discretion by excluding Leo’s testimony pursuant to MRE 702. For the reasons explained by the lead opinion, I agree that Leo’s proposed testimony was not the product of reliable principles and methods and thus is inadmissible on this basis alone. However, I disagree with the lead opinion’s conclusion that had Leo’s testimony been the product of reliable principles and methods, it would have been admissible. I do not believe that the trial court abused its discretion by concluding that Leo’s proposed testimony would not “assist the trier of fact to understand the evidence or to determine a fact in issue . .. .” MRE 702. “ ‘Expert testimony is not admissible . . . when it merely deals with a proposition that is not beyond the ken of common knowledge.’ ” Gilbert, 470 Mich at 790 (citation and emphasis omitted).
Leo proposed to testify that people sometimes falsely confess. However, this is not a proposition that is outside the “common knowledge” of the average juror. Jurors, as ordinary members of the community with ordinary measures of judgment, common sense, experience, and personal insight, understand that people sometimes falsely confess, although jurors also understand that false confessions are far from the norm. Defendant argues that jurors have a tendency to believe that people will not confess to a crime that they did not *151 commit. Quite likely, defendant is correct. However, this asserted tendency is not inconsistent with Leo’s own testimony at the Daubert hearing. Leo testified that most jurors assume that if the defendant confessed he is “probably guilty,” but Leo also acknowledged that “most confessions are true” and that “false confessions are the exception.” Therefore, as long as the prosecutor does not argue that people never falsely confess, which he has not argued here, Leo’s proposed testimony that false confessions are possible offers absolutely nothing of relevance to the jury.
“[T]here is no need for expert testimony that tells the jury what it already knows.” Comment, The (in)admissibility of false confession expert testimony, 26 Touro L R 23, 58 (2010). “As it stands, most jurors have a nuanced understanding that false confessions occur, but only rarely. An expert witness that simply repeats this fact is not ‘assisting the trier of fact.’ ” Id. at 59. As one commentator explained:
False confession theorists ... [argue that] false confession expert testimony helps combat against. .. the myth that false confessions do not occur. However, the numbers simply do not support the notion that this myth exists. For instance, one statistic used to demonstrate this myth is that sixty eight percent of potential jurors in the District of Columbia believe that suspects falsely confess “not very often” or “almost never.” Implying that these answers foreclose even the possibility of false confessions within the minds of jurors is simply wordplay: “not very often” and “almost never” do not mean “never.” In fact, the data clearly corroborates most jurors’ beliefs that concede the possibility of a false confession in a given case, while also noting its statistical improbability. The notion that some suspects might confess to something they did not do is within the common knowledge of jurors. [Id. at 56-57, citing in part Leo, Police Interrogation and American Justice, p 196 (2008).]
*152 Because Leo’s proposed testimony concerning the existence of false confessions is “ ‘not beyond the ken of common knowledge,’ ” Gilbert, 470 Mich at 790 (citation omitted), it is unlikely to “assist the trier of fact to understand the evidence or to determine a fact in issue,” MRE 702, and thus is inadmissible under MRE 702.[1]
Leo also proposed to testify that certain interrogation techniques are associated with false confessions. However, given that he admitted that these same interrogation techniques are also associated with true confessions, I fail to see how this testimony could assist the jury.[2] Informing the jury that certain interrogation *153 techniques result in either true or false confessions does nothing to advance the jury’s thinking. The jurors obviously know that the confession before them is either true or false, and it is their job to determine whether it is true or false. Instructing them that a confession is either true or false is only belaboring the obvious. “Rule 702’s ‘helpfulness’ standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.” Daubert, 509 US at 591-592. Because Leo admitted that there is no “scientific connection” between any of the interrogation techniques that he proposes to testify about and the truthfulness of a confession, his proposed testimony about these interrogation techniques does not satisfy the “helpfulness” standard of Rule 702.[3]
*154 As the Court of Appeals explained:
We conclude that the trial court did not abuse its discretion by excluding Dr. Leo’s testimony. The trial court concluded that Dr. Leo was qualified in terms of knowledge, but it excluded Dr. Leo’s testimony on several grounds including its finding that the testimony would not assist the trier of fact in understanding the evidence or in determining a fact at issue. MRE 702. This was not an abuse of discretion. Defendant essentially offered Dr. Leo’s testimony to help the jury determine the reliability of defendant’s confession. However, Dr. Leo’s testimony would not have involved a proposition that was outside the common knowledge of a layperson. Gilbert, 470 Mich at 790. Dr. Leo acknowledged that the same interrogation techniques that he determined led to false confessions could also lead to true confessions. He could not identify any unique correlation between certain police interrogation tactics and false confessions. Dr. Leo explained that the reliability of a confession is determined by considering whether aspects of the confession fit with the evidence in the case. Nothing in the record here indicates that a juror cannot perform this same analysis without the assistance of expert testimony. Further, the police interrogation of defendant was recorded and the jury will be able to review the recordings at trial. Additionally, the police officers will be subject to cross-examination with respect to their specialized training in the art of interrogation and techniques they may use to pressure a defendant into confessing to a *155 crime. The jury will be able to consider the manner in which defendant’s confession was elicited, and the way in which his statements progressed during the course of the interrogation, and it will be able to weigh the interrogation and confession with the remainder of the evidence introduced at trial and make a determination as to the credibility of the confession. No expert testimony is needed to assist the jury in this process. See People v Wolfe, 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992) (issues involving credibility are within the sole province of the jury). [People v Kowalski, unpublished opinion per curiam of the Court of Appeals, issued August 26, 2010 (Docket No. 294054), pp 3-4.]
As even the concurring/dissenting Court of Appeals judge explained, Leo’s “conclusion that certain police interrogation techniques are associated with false confessions ... is useless” because “[t]he police interrogation techniques Dr. Leo associated with false confessions are also associated with true ones and partially true ones, and there is no known difference in rates.” Id. at 2 (DAVIS, J., concurring in part and dissenting in part). “[A]ll Dr. Leo can tell us is that police interrogation techniques are associated with confessions,” and “[t]his association will not assist the jury[.]” Id. (emphasis in the original).[4]
Because Leo admitted that the same interrogation techniques that result in false confessions may also result in true confessions, his proposed testimony concerning interrogation techniques will not “assist the trier of fact to understand the evidence or to determine a fact in issue,” and thus it is inadmissible under MRE 702.
*156 B. TESTIMONY OF DR. WENDT
Wendt proposed to testify that defendant possesses some psychological traits that can lead to false confessions. However, given that he admitted that these same psychological traits can also lead to true confessions, this testimony is equally irrelevant.[5] Informing the jury, for example, that defendant is an “anxious” person, and that anxious people sometimes falsely confess, and also sometimes truthfully confess, does little to advance the jury’s thinking. The jury’s responsibility is to determine whether a confession is true or false, and unless an expert has something to offer the jury in this regard that will make it more or less likely that the confession is either true or false, the expert’s testimony is irrelevant. See MRE 401 (“ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”).
As the Court of Appeals correctly explained:
Dr. Wendt admitted that the same personality traits that correlate with false confessions can also lead to true confessions. Dr. Wendt could not identify a specific psychological factor that distinguishes a person who makes a false confession from one who makes a true confession. Thus, his testimony would have been of no help to the jury because the jury would have still been required to weigh defendant’s confession against the other evidence in the case to determine whether it was credible. [Kowalski, unpub op at 5.][6]
*157 C. MRE 403
Even assuming for the sake of argument that Leo’s and Wendt’s testimony is relevant and reliable, I believe that its “probative value is substantially outweighed by the danger of unfair prejudice . . . MRE 403. “Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury.” People v Crawford, 458 Mich 376, 398; 582 NW2d 785 (1998). As the United States Supreme Court has explained:
“Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.” [Daubert, 509 US at 595, quoting Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 FRD 631, 632 (1991).]
For the reasons explained earlier, I do not believe that the testimony at issue here is even “marginally probative evidence,” but even if it were, there would be a considerable risk that the jury would accord undue weight to the experts’ testimony. “Since experts base *158 their testimony on science, jurors tend to find the testimony more convincing, and therefore the risk of misleading and confusing them increases.” Comment, 26 Touro L R at 37. “ ‘[Qjuestions of credibility, whether of a witness or of a confession, are for the jury,’ ” Crane v Kentucky, 476 US 683, 688; 106 S Ct 2142; 90 L Ed 2d 636 (1986) (citation omitted), but the admission of expert testimony on the subject of false confessions, or on other subjects that are within the “common knowledge” of jurors and that pertain to credibility, have the potential to undermine the jury’s role in this regard. “Indeed, as we have cautioned before, the jury in these credibility contests is looking ‘to hang its hat’ on the testimony of witnesses it views as impartial,” People v Peterson, 450 Mich 349, 376; 537 NW2d 857 (1995), and it may easily come to perceive the testimony of the expert as supplying a shortcut for resolving credibility disputes between witnesses.
In the instant case, defendant will be arguing that the confession is false,[7] the prosecutor will be arguing that the confession is true, and the experts’ testimony concerning false confessions, if admitted, would be viewed by the jury as testimony from people who study false confessions for a living, in support of defendant’s position that the confession is false. Even though the experts will not be allowed to expressly testify that they believe that defendant falsely confessed, the jury will be led to believe that the experts know more than they are telling, because the jury will almost certainly infer that the experts must believe that defendant’s confession is *159 false or else they would not be testifying on his behalf. See Peterson, 450 Mich at 391 (CAVANAGH, J., dissenting). The danger that the jury will be misled by the experts’ testimony to believe that the interrogation techniques used by the police, in conjunction with defendant’s personality traits, must have resulted in a false confession is substantial, and thus the risk that the jury’s role in making credibility determinations will be undermined is also substantial.[8]
As a plurality of the United States Supreme Court explained in United States v Scheffer, 523 US 303, 313-314; 118 S Ct 1261; 140 L Ed 2d 413 (1998), regarding polygraph evidence:
A fundamental premise of our criminal trial system is that “the jury is the lie detector.” Determining the weight and credibility of witness testimony, therefore, has long been held to be the “part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.”
By its very nature, polygraph evidence may diminish the jury’s role in making credibility determinations. The common form of polygraph test measures a variety of physiological responses to a set of questions asked by the examiner, who then interprets these physiological correlates of anxiety and offers an opinion to the jury about whether the witness — often, as in this case, the accused— was deceptive in answering questions about the very matters at issue in the trial. Unlike other expert witnesses who testify about factual matters outside the jurors’ knowledge, such as the analysis of fingerprints, ballistics, or DNA *160 found at a crime scene, a polygraph expert can supply the jury only with another opinion, in addition to its own, about whether the witness was telling the truth. Jurisdictions, in promulgating rules of evidence, may legitimately be concerned about the risk that juries will give excessive weight to the opinions of a polygrapher, clothed as they are in scientific expertise and at times offering, as in respondent’s case, a conclusion about the ultimate issue in the trial. Such jurisdictions may legitimately determine that the aura of infallibility attending polygraph evidence can lead jurors to abandon their duty to assess credibility and guilt. [Citations omitted; emphasis in the original.]
Similarly, expert testimony concerning false confessions may diminish the jury’s role in making credibility determinations. Jurors may give excessive weight to this testimony and abandon or subordinate their own primary duties to assess credibility and guilt. “[T]he testimony would .. . convert the expert witness into a human lie detector,” and “[cjourts should be as wary of admitting human lie detectors as they are of admitting the results of a polygraph test.” Comment, 26 Touro L R at 57-58. “Our criminal justice system is founded on the belief that juries can understand when statements might be unreliable, and admitting expert testimony on false confessions upends this fundamental pillar.” Id. at 74. For these reasons, I do not believe that the trial court abused its discretion by concluding that the probative value of the experts’ testimony is substantially outweighed by the danger of unfair prejudice.[9]
*161 As the Court of Appeals explained:
Although both experts testified that they would not offer opinion regarding whether defendant made a false confession, that conclusion was implicit in both of their proposed testimonies. This would interfere with the jury’s role in determining the credibility and weight of the confession. Thus, there was a significant danger of unfair prejudice with respect to the proposed testimony; and, as discussed above, neither of the expert’s proposed testimony had high probative value. The trial court did not abuse its discretion by concluding that MRE 403 was an additional basis on which to exclude the proffered expert testimony. [Kowalski, unpub op at 5.][10]
*162 D. LEAD OPINION CASELAW
The lead opinion relies on Peterson, 450 Mich at 352-353, which held that
(1) an expert may testify in the prosecution’s case in chief regarding typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim’s specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim, and (2) an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim’s credibility.
Justice CAVANAGH, joined by Justice LEVIN, dissented and explained that he would have “continue[d] to limit the use of behavioral reaction testimony to rebuttal purposes” and “preclude[d] an expert. .. from making any reference to the particular complainant or defendant” because “[t]he marginal probative value of allowing the expert to further testify with respect to the particular complainant is substantially outweighed by the danger of unfair prejudice that the jury will misuse the testimony.” Id. at 381-382, 391.[11]
*163 The lead opinion also relies on People v Christel, 449 Mich 578, 580, 592; 537 NW2d 194 (1995), which held that “battered woman syndrome testimony is relevant and helpful [and thus admissible] when needed to explain a complainant’s actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting allegations of abuse” because “expert testimony is needed when a witness’ actions or responses are incomprehensible to average people.” Justice CAVANAGH, again joined by Justice LEVIN, concurred in part and dissented in part. He would have “limit[ed] the use of the battered woman syndrome evidence to the narrow purpose of rebutting an inference that the complainant’s postincident behavior is inconsistent with that expected of rape victims” and would not have “allow[ed] an expert witness to testify with respect to the complainant’s behavior in the particular case” because “the marginal probative value of allowing testimony with respect to the specific complainant’s behavior is substantially outweighed by the unfairly prejudicial danger that the jury may conclude that the expert, in fact, knows that the complainant has been a battered individual.” Id. at 601-602.
I agree with the lower courts that Peterson and Christel are fully distinguishable. First, they were decided before this Court amended MRE 702 to conform to Daubert, so the trial court’s gatekeeper role was *164 different than it is now. Under the pre-Daubert version of MRE 702, the trial court’s sole function was to determine whether the expert’s testimony was “generally accepted within the scientific community.” Craig v Oakwood Hosp, 471 Mich 67, 80; 684 NW2d 296 (2004). The trial court’s gatekeeping function is much broader under the current version of MRE 702. “Rule 702 . . . assign[s] to the trial judge the task of ensuring that an expert’s testimony both rests on a reliable foundation and is relevant to the task at hand.” Daubert, 509 US at 597; see also Kumho, 526 US at 152 (“The objective of [Daubert’s gatekeeping requirement] is to ensure the reliability and relevancy of expert testimony.”); Allison v McGhan Med Corp, 184 F3d 1300, 1310 (CA 11, 1999) (“[W]hile Rules 401 and 402 reflect the general policy of the Federal Rules for liberal admission of evidence, Rule 403, working in conjunction with Rules 702 and 703, militates against this general policy by giving courts discretion to preclude expert testimony unless it passes more stringent standards of reliability and relevance. These stricter standards are necessary because of the potential impact on the jury of expert testimony.”). Furthermore, although it is common knowledge that sometimes people falsely confess, knowledge of how a sexually abused child or a battered woman may react to the abuse may not be so common. While it is one thing for this Court to hold that psychological expert testimony may be necessary in extraordinary and narrow circumstances involving a sexually abused child or a battered woman — in which it is the remarkable sense of dependency of the victims on those who have abused them that may explain their conduct — it is quite another to extend this proposition, as the lead opinion does, to commonplace circumstances in which a competent person has confessed to committing a crime. An ordinary juror may well lack the life’s experience to *165 comprehend what is entailed in the extraordinary relationships of the sexually abused child and the battered woman, but deciding ordinary questions of witness credibility lies at the heart of the juror’s responsibility.[12]
The lead opinion also relies heavily on People v Hamilton, 163 Mich App 661; 415 NW2d 653 (1987), which held that the trial court abused its discretion by excluding expert testimony concerning the defendant’s psychological makeup because the jury should have been able to use this evidence to assess the defendant’s credibility. First, this case too was decided before MRE 702 was amended to adopt Daubert’s standards. Second, Hamilton did not address at all whether the probative value of the proposed testimony was substantially outweighed by the danger of unfair prejudice under MRE 403. Furthermore, the defendant in Hamilton was a *166 16-year-old child when he committed the offenses and, although he was 22 years old when he confessed, he was operating psychologically at the level of a 15-year-old. Hamilton is distinguishable from the instant case because Hamilton involved a child with a disability, while the instant case involves an adult with no disability. Therefore, it is not necessary for this Court in this case to determine whether Hamilton was correctly decided.
E. PRINCIPAL CONCERN
My principal concern with the lead opinion pertains to its holding that expert testimony concerning false confessions, if reliable, is admissible because it is beyond the “common knowledge” of the average juror. I disagree with this assertion and am concerned that such a holding has the potential to open up the floodgates for expert testimony on a host of reasonably obvious matters of human behavior that have never been generally thought to require expert testimony. As a result, criminal trials will be increasingly converted into battles of psychological experts. See State v Sabetta, 680 A2d 927, 933 (RI, 1996) (“[T]o introduce the expert testimony of a psychologist concerning the unreliability of eyewitness memory. . . would effectively invade the province of the jury and . . . open a floodgate whereby experts would testify on every conceivable aspect of a witness’s credibility.”).
What other reasonably obvious matters of human behavior are beyond the “common knowledge” of the average juror, and may therefore necessitate expert testimony? Is it within the “common knowledge” of the juror that it is possible for a witness to inadvertently testify inaccurately or for a witness to deliberately testify falsely? Is it within the “common knowledge” of the juror that some parts of a witness’s testimony may *167 be true, while others may be false? Is it within the “common knowledge” of the juror that eyewitness recollections may differ, although each eyewitness is testifying honestly? Is it within the “common knowledge” of the juror that sometimes police officers testify falsely and sometimes convicted felons testify truthfully? Is it within the “common knowledge” of the juror that it is possible for an eyewitness to misidentify a person? Is it within the “common knowledge” of the juror that memories fade over time? Is it within the “common knowledge” of the juror that particular forms of body language may sometimes evidence honesty or dishonesty? Should we or should we not require expert testimony regarding each of these matters? If not, why not and, if so, what exactly should be left for the jury to decide on its own?
Until today, “such normal human processes were held to be within the knowledge and experience of the jury, the triers of fact, thus requiring no expert opinion to clarify or inform their rational decision-making roles.” Clifford, Expert Testimony, in Towl & Crighton, eds, Forensic Psychology (Chichester: Blackwell Publishing Ltd, 2010), ch 4, p 47. After today, however, will criminal trials increasingly become a battle of psychologists? Although a battle of psychologists may well be useful in contexts beyond the ken of the ordinary juror, it seems considerably less useful in the context of making commonsense credibility determinations— exactly the type of determinations that we have always before entrusted to the jury. See United States v Alexander, 816 F2d 164, 169 (CA 5, 1987) (“Requiring the admission of the expert testimony proffered . . . would have established a rule that experts testifying generally as to the value of eyewitness testimony would have to be allowed to testify in every case in which eyewitness testimony is relevant. This would constitute a gross *168 overburdening of the trial process by testimony about matters which juries have always been deemed competent to evaluate.”). Indeed, making such commonsense credibility determinations has always been at the heart of the jury’s role within our criminal justice system, and this core responsibility should not, in my judgment, be supplanted by a growing role for psychological expert testimony.[13]
IV CONCLUSION
Because I agree with the Court of Appeals that the trial court did not abuse its discretion by excluding the expert witness testimony, I would affirm the judgment of the Court of Appeals.

 The lead opinion contends that its conclusion that the fact that someone might falsely confess is “contrary to common sense” is supported by “[o]ur ‘statement against interest’ exception to the hearsay rule [which] embodies [the] presumption. . . ‘that a reasonable person ... would not have made [such a] statement unless believing it to be true.’ ” Ante at 127-128, quoting MRE 804(b)(3). However, what the lead opinion wholly fails to recognize is that Leo does not dispute that people generally do not falsely confess. Leo knows this, and jurors know this. Leo and jurors also know that there are exceptions to this general presumption and that people sometimes do falsely confess. There is absolutely nothing inconsistent between the notions that people generally do not falsely confess and that people sometimes do falsely confess and I do not believe that either of these notions lies outside the common knowledge of jurors. See State v Free, 351 NJ Super 203, 220; 798 A2d 83 (2002) (citation omitted) (“Although our rules of evidence recognize that people do not usually make statements against their penal interest unless they are true, it does not follow that ordinary jurors believe that all confessions made by defendants subjected to police interrogation are true.”); see also Comment, 26 Touro L R at 53 (“That false confessions occur is a matter of fact; however, it is also true that false confessions are rare.”).

 For example, Leo testified:
[P]olice using coercive techniques sometimes results in true confessions, sometimes results in false confessions.
*153 The coercive, problematic techniques that might, when applied to an innocent person, lead to a false confession, but when applied to a guilty person, lead to a true or a partially true confession. You can’t infer from the techniques used whether you’ll get a true or false confession.
[T]he interrogation process .. . can lead to both true and false confessions.

 As the Ohio Court of Appeals explained:
Dr. Leo .. . explained that coercive interrogation techniques do tend to be effective in producing their desired result: a confession. He conceded on cross-examination, however, that coercive techniques are also effective in inducing true confessions and he could not offer any opinion as to how many of the resulting confessions are truthful and how many are false. Thus, he could offer no expert insight into the actual likelihood that coercive interrogation tactics will lead to a false confession.
As explained above, Dr. Leo conceded that he could not predict when a confession was false, nor could he opine that coercive interrogation tactics are more likely to yield false confessions *154 instead of truthful ones. Dr. Leo could not offer an opinion on which interrogation techniques lead to false confessions, he had no information about the percentage of confessions that are truthful or false, nor could he analyze a given confession and offer an opinion as to whether it was true or false.
It was not beyond the knowledge of lay jurors that coercive police interrogation tactics might be more likely to induce a confession from a criminal suspect, nor was the fact that suspects do sometimes falsely confess to a crime. [State v Wooden, unpublished opinion of the Ohio Court of Appeals, issued July 23, 2008 (Docket No. 23992), pp 7-9; 2008-Ohio-3629, ¶¶ 22, 26, 28.]

 Similarly, the trial court explained:
If... the same techniques can lead to a true or false confession, I don’t understand what relevance it would have, what relevance there would be to having Dr. Leo testify about police techniques. I don’t see how he can assist the jury, how he can he helpful to the jury.

 For example, when asked whether “people who have the psychological factors that you’ve talked about can just as equally truly confess,” Wendt answered, “Correct.”

 See also Bixler v State, 582 NW2d 252, 256 (Minn, 1998) (“Clearly the trial court was well within its discretion in ruling that the jury, without *157 the testimony of the psychological expert, was fully capable of observing and understanding [the defendant’s] propensity to please authority figures, and taking those observations and that understanding into account in evaluating his confession.”); People v Wood, 341 Ill App 3d 599, 608; 793 NE2d 91 (2003) (“Dr. Greenberg’s testimony was properly barred” because “Dr. Greenberg’s testimony that defendant was easily coerced and susceptible to intimidation is not beyond the understanding of ordinary citizens, nor is the concept difficult to understand.”). Furthermore, in the instant case, Wendt’s proposed testimony that defendant may have been vulnerable to interrogation techniques is particularly irrelevant in light of the interrogating officer’s testimony that he was actually “tryfing] to talk [defendant] out of the confession” because defendant “had already told [the officer he] had done something and [the officer] didn’t believe the details.”

 Defense counsel argues that if he were not allowed to present the expert witness testimony to the jury, he would be left with no response whatsoever to defendant’s confession. This is simply untrue. In fact, defense counsel would be left with what is, in my opinion, the best response to the confession: defendant’s own explanation regarding why he confessed.

 For a discussion of the potential of expert psychological testimony to mislead jurors, see Clark v Arizona, 548 US 735, 774-778; 126 S Ct 2709; 165 L Ed 2d 842 (2006) (“[T]hese empirical and conceptual problems add up to a real risk that an expert’s judgment in giving. . . evidence will come with an apparent authority that psychologists and psychiatrists do not claim to have.”).

 I disagree with the lead opinion’s conclusion that its “safeguards,” such as the availability of a limiting instruction, “negate the danger that the expert testimony will interfere with the jury’s role.” Ante at 137 n 74. If that were the case, a limiting instruction would be able to cure all concerns relating to the probative value of evidence being “substantially outweighed by the danger of unfair prejudice,” and MRE 403 would be rendered meaningless. That is, if it were sufficient to simply instruct the jury not to allow evidence’s “probative value [to he] substantially *161 outweighed hy the danger of unfair prejudice,” there would be no point in having a court rule that specifically provides that “evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice .. ..” MRE 403. The lead opinion’s other “safeguard” of not allowing the expert to expressly state that the defendant falsely confessed also does little to alleviate concerns about misleading the jury. When a jury is confronted with expert testimony that certain interrogation techniques may result in false confessions paired with testimony that the defendant himself was subject to these interrogation techniques, the invited inference will be just as misleading as expert testimony stating outright the conclusion that the defendant falsely confessed. See Peterson, 450 Mich at 392 (CAVANAGH, J., dissenting).

 Appellate courts in other jurisdictions have likewise concluded that a trial court does not abuse its discretion when it excludes expert testimony on false confessions. See, for example, Wooden, unpub op at 10; 2008-Ohio-3629 at ¶ 29 (holding that the trial court did not abuse its discretion by excluding Dr. Leo’s testimony because it “would not offer the jurors any insight outside their own knowledge and experience”); Vent v State, 67 P3d 661, 669 (Alas App, 2003) (holding that the trial court did not abuse its discretion by concluding that “Dr. Leo’s testimony would not appreciably aid the jury in determining whether [the defendant] made a false confession”); State v Cobb, 30 Kan App 2d 544, 567; 43 P3d 855 (2002) (holding that “[t]he type of testimony given by [Dr.] Leo in this case invades the province of the jury and should not be admitted”); Free, 351 NJ Super at 221 (holding that the trial court abused its discretion by admitting expert testimony that amounted to “ ‘nothing more than an assertion that false confessions do occur’ ” because such testimony “would be of no assistance to the jury”) (citation omitted); United States *162 v Adams, 271 F3d 1236, 1246 (CA 10, 2001) (holding that “[t]he judge was well within his discretion in determining that the evidence lacked relevance and would not ‘assist the trier of fact as required by Rule 702’”) (citation omitted); State v Davis, 32 SW3d 603, 609 (Mo App, 2000) (holding that the trial court did not abuse its discretion by excluding Dr. Leo’s testimony because “the jury would not be aided by Dr. Leo’s testimony”); State v Ritt, 599 NW2d 802, 811-812 (Minn, 1999) (holding that “the trial court was within its discretion in excluding the expert testimony” because “the credibility of witnesses in criminal trials [should not] turn on the outcome of a battle among experts”); State v Tellier, 526 A2d 941, 943-944 (Me, 1987) (holding that the trial court did not abuse its discretion by excluding testimony “that false confessions do occur” because “its probative value was substantially outweighed by the danger of confusing the issues and of misleading the jury”).

 The dissent further explained that such expert testimony
*163 invades the province of the jury to assess credibility. It invites the jury to give undue weight'to testimony that is foundationally and fundamentally unreliable merely because it is cloaked with the expertise of an expert. It also invites the jury to believe that the expert knows more than he is telling, by letting the jurors infer that the expert, who works with sexually abused children every day, must believe this child’s story or else the expert would not be testifying. [Peterson, 450 Mich at 391 (Cavanagh, J., dissenting).]

 The lead opinion contends that I “unreasonably assume[] that the ordinary juror has the ‘life’s experience to comprehend’ the circumstances of police interrogation . . . and the effect of a defendant’s particular psychological traits on the outcome of the interrogation.” Ante at 127 n 48 (citation omitted). However, the lead opinion fails to explain how Leo’s proposed testimony that the same police interrogation techniques that cause false confessions also cause true confessions or Wendt’s proposed testimony that the same psychological traits that cause false confessions also cause true confessions will in any way help the jury decide whether the “circumstances of police interrogation” or defendant’s “particular psychological traits” caused him to truthfully or falsely confess. Furthermore, as the Court of Appeals explained:
[T]he police interrogation of defendant was recorded and the jury will be able to review the recordings at trial. Additionally, the police officers will be subject to cross-examination with respect to their specialized training in the art of interrogation and techniques they may use to pressure a defendant into confessing to a crime. The jury will be able to consider the manner in which defendant’s confession was elicited, and the way in which his statements progressed during the course of the interrogation, and it will be able to weigh the interrogation and confession with the remainder of the evidence introduced at trial and make a determination as to the credibility of the confession. [Kowalski, unpub op at 4.]

 The lead opinion contends that I have “exaggerated” its ramifications because its “holding is limited to the principle that a claim of a false confession is beyond the common knowledge of the ordinary person ... .” Ante at 142-143. However, given its holding that “a claim of a false confession is beyond the common knowledge of the ordinary person,” it is hardly “exaggerated” to question what other reasonably obvious matters of human behavior are, in the lead opinion’s judgment, also “beyond the common knowledge of the ordinary person” and thus in need of expert testimony. Indeed, the lead opinion has already shown its inclination to be highly expansive regarding its “beyond the common knowledge of the ordinary person” standard by analogizing false confessions to the dependency of child sexual abuse victims and battered women on their abusers.